**T.V. SPANO BUILDING
CORPORATION,
Appellant,**

v.

**John E. WILSON, III, Secretary of Delaware Department of Natural Resources and Environmental Control, Appellee and Cross–Appellant,**

v.

**Thomas V. SPANO, Cross–Appellee.**

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 16, 1990.
Decided: June 15, 1990.

Richard D. Allen, and Palmer L. Whisenant, Morris, Nichols, Arsht & Tunnell, Wilmington, for appellant and cross-appellee.

Kevin P. Maloney, Deputy Atty. Gen., Dept. of Natural Resources and Environmental Control, for appellee and cross-appellant.

TAYLOR, Judge.

This 15th day of June, 1990.

This is an appeal from a decision of the Environmental Appeals Board [Board] by T.V. Spano Building Corporation [TVSBC] and cross-appeal by John E. Wilson, Secretary of Delaware Department of Natural

Resources & Environmental Control [DNREC].[1] Jurisdiction of the Court to address this appeal is exercised pursuant to 7 *Del.C.* §§ 6009, 6313 and 29 *Del.C.* § 10161(9).

## I.

TVSBC is a corporation engaged in the construction of residential homes. TVSBC developed a tract of land located in New Castle County, Delaware as a residential development known as Raintree Village. During construction at Raintree Village TVSBC removed a number of trees. To dispose of these trees a subcontractor to TVSBC buried them, along with other unspecified waste, in a series of pits located within the Raintree Village development.

On September 24, 1987, after some of the houses had been constructed, sold and occupied, a plumber installing a sump pump in the basement of 27 Jonathan Drive in Raintree Village development, lit a cigarette lighter in the sump area and experienced a burst of blue flame coming from the sump hole. The plumber covered the sump hole and reported the incident to the homeowner. Upon investigation the homeowner met with similar results when he exposed the sump hole to flame.

The homeowner reported the problem to the local fire company which in turn contacted DNREC's Emergency Response Team. The Emergency Response Team conducted a series of tests and by the morning of September 25 determined that the flame was caused by methane gas. Based on their findings at 27 Jonathan Drive DNREC tested other homes in Raintree Village. DNREC discovered methane gas in 11 other Raintree Village homes and by the afternoon of September 25 ordered the evacuation of those homes.

Between September 25 and continuing to October 1, DNREC conducted an investigation to determine the source of the methane gas. This investigation included interviews with Raintree residents, making and recording personal observations, reviewing the TVSBC development plot plan for Raintree Village, and monitoring each of the affected homes to ascertain the quantity of the methane gas.[2]

On September 26 DNREC installed ventilation systems in some of the affected homes in order to prevent a build up of methane gas. By October 1 all of the evacuated residents of Raintree Village were permitted back into their homes.

## II.

On October 1, 1987 DNREC issued an Order [Order] to TVSBC and Thomas V. Spano, [Spano] Vice–President, Secretary, and Treasurer of TVSBC which is the subject of this appeal. In that Order DNREC made preliminary findings of fact, cited violations of 7 *Del.C.* Ch. 60, and ordered TVSBC and Spano to take certain corrective actions to remedy the methane problem.

DNREC's preliminary findings of fact concluded that there was a significant amount of solid and other waste improperly and illegally disposed of at the Raintree Village development. Based on their preliminary findings, DNREC found numerous violations of 7 *Del.C.* Ch. 60 and the Delaware Solid Waste Regulations [Regulations]. Specifically DNREC found violations of 7 *Del.C.* § 6003(a)(4) disposal of solid waste without a permit; improper disposal of waste in violation of Regulations §§ 3.01 and 6.01–.05; violation of Regulation § 3.06(d)(10) for disposal of solid waste without DNREC approval; discharge of air contaminants without a permit in violation of 7 *Del.C.* § 6003(a)(1); engaging in activity that may cause or contribute to discharge of a pollutant into surface or groundwater in violation of 7 *Del.C.*

---

**1.** Reference to DNREC will include the Secretary and/or the Acting Secretary of Delaware Department of Natural Resources & Environmental Control unless otherwise stated.

**2.** This monitoring consisted of interval measurements recorded every four hours by a device called an explosimeter. Readings from the explosimeter indicated high levels of methane present in the evacuated homes. Measurements at 27 Jonathan Drive showed readings of 100% of the LEL for methane.

§ 6003(a)(2); and failure to report to DNREC the disposal of solid waste and discharge of an air contaminant and water pollutant in violation of 7 *Del.C.* § 6028.

From their preliminary findings DNREC concluded that the "presence of methane at [Raintree] . . . poses an imminent and substantial hazard to public health and the environment." DNREC ordered TVSBC and Spano, pursuant to 7 *Del.C.* § 6308 [3], to take specific corrective actions. TVSBC and Spano were ordered to hire a consultant, approved by DNREC, to investigate and develop a plan for the clean-up, mitigation and abatement of the air and water contaminants, to implement that plan, and to operate and maintain the ventilation systems previously installed in the Raintree Village homes by DNREC. In addition, both TVSBC and Spano were ordered to reimburse DNREC for all costs incurred during the investigation, and to pay for the clean-up and related expenses.

## III.

TVSBC and Spano appealed to the Board based on DNREC's October 1 Order. The Board held a hearing at which it heard live testimony from a number of witnesses and reviewed documentary evidence submitted by all parties. The Board affirmed that

part of the Order relating to TVSBC's involvement in Raintree Village; however, the Board reversed that part of the Order which found Spano personally liable. From that decision both, TVSBC and DNREC appealed.[4]

■ On appeal from the Board, this Court's jurisdiction is limited to a determination of whether the Board's decision is supported by substantial evidence and free from legal error. 29 *Del.C.* § 10142; *Olney v. Cooch,* Del.Supr., 425 A.2d 610 (1981). Substantial evidence is defined to mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it is more than a scintilla but less than a preponderance. *Olney, supra,* at 614.

### A.

■ TVSBC and Spano contend that the Order is invalid because it requires them to take actions which are not related to eliminating any imminent and substantial hazard at Raintree Village. Since the Order was made in the exercise of the power conferred by § 6308, it is essential to review the several requirements imposed by the Order upon TVSBC and Spano at their expense.

---

**3.** 7 *Del.C.* § 6308 states:

Notwithstanding any other provision of this chapter, the Secretary, upon receipt of information that the storage, transportation, treatment, or disposal of any hazardous waste may present an imminent and substantial hazard to the health of persons or to the environment, may take such action as he determines to be necessary to protect the health of such persons or the environment. The action the Secretary may take includes, but is not limited to:

(1) Issuing an order directing the operator of the treatment, storage or disposal facility or site, or custodian to take such steps as are necessary to prevent the act or eliminate the practice which constitutes such hazard. Such action my include, with respect to a facility or site, permanent or temporary cessation of operations;

(2) Issuing an order directing the persons who previously owned or operated a treatment, storage or disposal facility or site which constitutes such hazard and who are determined by the Secretary to be responsible for

activities causing the hazard, to take such steps as are necessary to eliminate the hazard;

(3) Enforcement action under § 6309 of this title;

(4) Directing Department personnel to undertake emergency cleanup and remedial measures. The Secretary may recover the costs of such measures from the responsible party.

**4.** TVSBC having appealed all aspects of the Board's decision except that portion which relieved Spano of personal liability now contends that the Court should find that all of the Order is moot and should deal only with that portion of it which requires TVSBC to reimburse DNREC for its expenses in dealing with the methane problem. TVSBC has not chosen to withdraw its appeal. If in fact the Order has been fully complied, executed and nothing remains to be considered, it has taken no action to limit the issues. The Court will discuss the issues raised by TVSBC in its briefs. It is not clear what TVSBC intends to accomplish by its position. Clearly, if the Order is valid, it should not be cast aside by the actions of this Court.

The first requirement was to hire a consultant to investigate the subsurface and determine the extent of the methane and other contamination.

The second requirement was for the consultant to prepare a plan for abating the contamination.

The third requirement was to maintain equipment and monitoring system until the plan for abatement was implemented.

The fourth requirement was to implement the plan at their expense.

The fifth requirement was that TVSBC and Spano reimburse DNREC for its expenses in investigating, monitoring and taking remedial action with respect to the condition at the development.

Only the fifth requirement deals with reimbursement of DNREC. Therefore, only that requirement invokes § 6308(4). The other requirements, which impose specific obligations upon TVSBC and Spano, invoke either subparagraph (1) or (2) of § 6308. Subparagraph (1) authorizes the Secretary to order the custodian of the hazardous waste to take action to prevent or eliminate the hazardous practice. Subparagraph (2) authorizes the Secretary to order the persons responsible for activities causing the hazard to take steps necessary to prevent or eliminate the hazard. The actions required by the Order directed toward eliminating the flow of methane gas were a reasonable exercise of the statutory authority where the hazard involved the uncontrolled flow of underground methane from the site where hazardous waste was buried. Where a person causes or permits his property to become contaminated in such a way as to create a hazard to persons or the environment, it is appropriate and permissible that the expense of returning the site to a condition which is no longer a hazard should be borne by the person or persons who caused or permitted the hazard to exist.

### B.

TVSBC contends that the Order is invalid because the tree debris that was placed in the pit was not hazardous waste. Hazardous waste is defined as:

> A solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical or infectious characteristics may ... pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed.

7 *Del.C.* § 6302(7).

Solid waste is broadly defined as:

> Any garbage, refuse, ... and other discarded materials ...

7 *Del.C.* § 6302(12).

The Order made certain preliminary findings that are pertinent to the nature of the substances buried at the development:

(1) a significant amount of solid and other waste was found to have been improperly disposed of at the development;

(2) solid and other waste is known to generate methane gas during decomposition;

(3) solid and other waste was found to be buried under portions of properties of the affected homes;

(4) methane is known to migrate from its place of origin by way of underground water and volatilizing and diffusing through soil;

(5) methane resulting from decomposition of solid and other waste was found at or in excess of the lower explosive limit in basements of 12 homes in the development;

(6) the presence of methane at the development in concentrations at or in excess of the lower explosive level poses an imminent and substantial hazard to the public health and the environment;

(7) solid and other waste was found buried in contact with the groundwater underlying the development and caused contamination of the groundwater at the development.

Although these findings do not use the words "hazardous waste," the findings do embody the requisites set forth in the definition of "hazardous waste" expressed in 7 *Del.C.* § 6302(7). These findings are supported by substantial evidence. I find that by these findings the Order established a

finding that hazardous waste had been disposed of at the development known as Raintree Village.

■ TVSBC also contends that the tree debris that was buried at the site was not hazardous waste at the time it was disposed of at the site and therefore its disposal did not violate 7 *Del.C.* Ch. 63. TVSBC argues that to be hazardous waste under Chapter 63 the waste must have been hazardous at the time it was transported, disposed, etc. This argument overlooks the breadth of the definition of "hazardous waste". 7 *Del.C.* § 6302(7). If the solid waste "may ... pose a substantial present or potential hazard to human health or the environment when improperly ... disposed of" it is hazardous waste under Chapter 63. Thus, the existence of a substantial potential hazard to human health or the environment arising from improper disposal is the determinant and not the existence of a present hazardous condition in the substance disposed of which determines whether the substance is hazardous waste. Applying that standard, if the waste had the potential of being a hazard when it was improperly disposed of, that waste at the time of its disposal was hazardous waste. In this case the findings showed that the buried material probably generated the methane that seeped into the houses. Therefore, the buried material was hazardous waste when buried.

### C.

■ TVSBC contends that at the time the Order was issued there was no imminent and substantial hazard at the development. This argument rests on the fact that beginning on September 26, 1987, DNREC had installed ventilation systems in the houses where the methane gas had been found and the ventilation reduced the risk that the gas would become an explosive concentration.

From their investigation, DNREC had evidence that methane gas was seeping into the basements of various occupied houses in the development. Before DNREC took action to remove or dilute concentrations of the gas by ventilation it was collecting in one or more houses in flammable and near explosive quantities. Shortly after the plumber caused the explosion at an occupied house in the development, the gas supply to the development was turned off and the gas and sewage lines at the development were checked for possible methane leakage. This action in part allowed DNREC to diminish the possibility that the methane was coming from either of these sources. In addition, air and water tests were made at regular intervals. DNREC also conducted interviews of neighborhood residents and conferred with representatives of TVSBC. Environmental Protection Agency agents [EPA] concluded by September 25 that the explosion was caused by methane gas. This conclusion was subsequently confirmed by a testing laboratory. The Christiana Fire Company ordered evacuation of 12 homes where the greatest concentration of methane was found. On September 25 DNREC installed ventilation systems in the 12 houses to provide continuous removal of the gas from the basements of those houses.

DNREC's examination of the plot plan of the development showed the pits used for disposal of debris from the clearing and construction of houses in the development.

On September 28 DNREC received a report from an EPA consultant which found that methane gas was present in most locations in the development, with much lower concentrations outside the development, and that the highest concentrations were in the vicinity of the disposal pits.

In view of this information it was probable that in the absence of artificial ventilation the accumulation would reach the explosive concentration again. The ventilation equipment DNREC provided reduced the methane concentration below the explosive level and was operated by electricity. As long as methane continued to seep from the ground into the houses the safety of the houses was dependent on the continuity of the electric power supply. Common experience is that electric power is interrupted on occasion. Clearly, continuous seepage of methane from underground source when considered with the possibility of

power interruption provided sufficient ground to support the DNREC finding that the condition posed a potential hazard which warranted immediate action under 7 *Del.C.* § 6308.

In *Formosa Plastics Corp. v. Wilson,* Del.Supr., 504 A.2d 1083 (1986) the Delaware Supreme Court noted:

A catastrophe need not happen before a State Official can take reasonable emergency action to thwart a reasonably apparent imminent threat to the public.

*Id.* at 1090. The same concerns for potential harm which prompted the Supreme Court to make the observation quoted above support the DNREC's action in this case.

### D.

TVSBC contends that the Secretary's action was taken without a hearing and therefore the Secretary's Order deprived them of property without due process. It relies on *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), to support this contention that the failure of the Secretary to hold a hearing before entering the Order deprived them of due process.

The application of *Fuentes* with respect to an action taken by the Secretary of the Department of Natural Resources and Environmental Control was considered by the Delaware Supreme Court in *Formosa Plastics Corp. v. Wilson, supra.* In *Formosa* the Supreme Court held that revocation of an environmental permit by the Secretary is subject to procedural due process requirements of notice and hearing. It further recognized that extraordinary circumstances may justify pre-hearing action by the Secretary. Applying that standard to the *Formosa* facts, the Court found that considerations of safety for the people living nearby and past experience of dangerous emission by the license holder and the State's close control over the licensed activity justified action by the Secretary without awaiting a due process notice and hearing. I conclude that the considerations which the Court applied in *Formosa* apply to an order of the Secretary which imposes a duty upon a party to take action is subject to the same considerations which were applied in *Formosa.*

The discussion earlier in this opinion of the immediate hazard involved here and the statutory regulation of hazardous waste qualify the portions of the Order requiring reasonable steps to eliminate the risk to the community as an extraordinary circumstance justifying pre-hearing action. Removal of a substance which has been deposited in violation of law and which has demonstrated its propensity to cause fire in buildings occupied as residences is a matter which should not be delayed to await a hearing. Imposing that duty upon the owner or developer where that party has been notified of the DNREC investigation and has participated in detecting the nature and source of the hazard and in reducing the danger did not render the Order invalid by virtue of lack of a hearing.

A further consideration of this appeal is that by virtue of 7 *Del.C.* §§ 6008, 6312 the Order was subject to appeal to the Board. TVSBC and Spano timely appealed the Secretary's Order to the Board. Under 7 *Del.C.* § 6313 and 29 *Del.C.* § 10161(9), the appellants were entitled to a hearing on those subjects encompassed in the Order. The Board is empowered to "affirm, modify or revise the decision of the Secretary." 7 *Del.C.* § 6008. Appellants were accorded a hearing before the Board on their appeal. After the rendering of the Board's decision, TVSBC's obligations are those which have been determined by the Board to be appropriate under the facts and legal arguments presented at the hearing. It is that determination which is the subject of this appeal. Appeal before this Court tests the validity of the Board's decision. If due process requirements were met by the Board, the failure of the Secretary to satisfy such requirements should not invalidate the decision of the Board if that decision satisfies substantive requirements.

### E.

The briefs have noted that at the Board hearing the Board limited evidence to facts which were available to the Secretary as of the date of the Order. This was

an appropriate standard to be applied in determining whether the Secretary was warranted in initiating action under 7 *Del.C.* § 6308 because the initiation of action to correct a condition presenting an imminent and substantial hazard requires prompt action before all of the facts can be ascertained and under the statute is based on information which the Secretary has received. However, the Board's function does not stop with that determination.

The appeal to the Board deals not only with the Secretary's justification for entering the Order in reliance on § 6308. It also deals with the substance of the Order, such as the source of the methane and who caused and should be responsible for the conditions at Raintree Village. The Board is empowered to affirm, modify or reverse the Secretary's decision. 7 *Del.C.* § 6008. The hearing on appeal to the Board occurred some time after the Secretary entered the Order.

The hearing before the Board is the initial hearing provided by 7 *Del.C.* Ch. 63. That hearing should afford a full opportunity to present evidence on the subjects which are relevant to merits of the Secretary's Order. Issues that may be raised before the Board on the Order in this case may include the nature of the buried substances, whether the substances possessed hazardous characteristics as defined in 7 *Del.C.* § 6302(7), who are the parties involved, and whether the action of the Secretary was reasonable and justified. In deciding those issues the hearing should be open for the presentation of all available information as of the time of the Board hearing and should not be limited to information available to the Secretary when he entered the Order. Because of the broad scope of action which the Board is empowered to take, the Board was not justified in limiting the presentation of relevant facts that may be presented at the hearing by confining the testimony to facts which were available to the Secretary on October 1, 1987.

In view of the restrictions which the Board placed upon presentation of evidence at the hearing, I find that TVSBC and Spano have not been accorded a proper due process hearing.

## IV.

The next issue is whether Spano can be held liable as well as TVSBC for the corrective actions required by the Order. The Order found that Spano was a responsible party and imposed liability on him. The Board reversed the Order with respect to Spano on the following grounds:

> The Board finds that the Secretary's authority extended to T.V. Spano Building Corporation but not Mr. Spano personally. There is insufficient evidence to support any basis for holding Mr. Spano liable personally. It is clear on the record that the Corporation owned the property and that the Corporation was the custodian and overseer of all building operations. Although Mr. Spano personally oversaw such operations, he did so in his capacity as an officer of the Corporation.

DNREC has appealed this portion of the Board's decision.

The finding that Spano is not liable for his actions in overseeing the operations at the development because "he did so in his capacity as an officer of the Corporation" evidences a lack of understanding of the liability of corporate officers and employees for wrongful actions in which they took part that cause damage to people who are not a part of the corporation.

First, a corporation is a legal entity which can act only through the actions of living persons. 3A *Fletcher Cyclopedia Corporations* § 1134, p. 265. Officers and employees of a corporation are not liable for business transactions made on behalf of and in the name of the corporation. However, corporate officers are liable for their tortious conduct even though they were acting officially for the corporation in committing the tort. *Id.* § 1135, p. 267.

> In other words, corporate officers, charged in law with affirmative responsibility in the management and control of the corporate business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and

direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring their consent or approval.

*Id.* "The rules governing liability of agents in general to third persons for their torts are almost invariably applicable to the liability of corporate officers to third persons for their torts...." *Id.* p. 268.

2 *Restatement of Agency* 2d § 343 states:

> An agent who does an act otherwise a tort is not relieved from liability by the fact that he acted at the command of the principal or on account of the principal
> . . .

A further statement in § 344 is also applicable here:

> An agent is subject to liability, as he would be for his own personal conduct, for the consequences of another's conduct results from his directions if, with his knowledge of the circumstance, he intends the conduct, or its consequences
> . . .

An illustration following the quoted language from § 344 shows the applicability of the language:

> A, foreman of a gang of track workers, directs some of the workers to obtain wood from a specified field which belongs to T. A is subject to liability to T for the trespass.

In this case the tortious conduct related to the disposal of hazardous waste in violation of the statute. The principles described above should be applied in determining Spano's personal liability.

## V.

The decision of the Board is REVERSED and the entire matter REMANDED for a full hearing and application of the law as determined in this decision.

IT IS SO ORDERED.