Joseph J. GALLAGHER, Mary Jane Gallagher, Terry W. Masters, Cynthia L. Masters, Randall R. Miller, Mark E. Moser, Judith S. Moser, Raymond R. Muller, Angela M. Muller, Richard Noonan, Diana Noonan, Joseph E. Roach, Anthony M. Thomas and Dorothy S. Thomas, Plaintiffs,

v.

T.V. SPANO BUILDING CORPORATION, Concord 2 Associates, Inc., Thomas V. Spano and DiSabatino Bros., Inc., Defendants.

Civ. A. No. 89–25–SLR.

United States District Court,
D. Delaware.

Sept. 16, 1992.

Jeffrey M. Weiner, Wilmington, Del., and Gerald J. Williams, of Williams & Cuker, Philadelphia, Pa., for plaintiffs.

Richard D. Allen, and Palmer L. Whisenant, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants T.V. Spano Bldg. Corp., Concord 2 Associates, Inc. and Thomas V. Spano.

Anthony G. Flynn, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., for defendant DiSabatino Bros., Inc.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

Before the Court are motions for summary judgment submitted by defendants DiSabatino Bros., Inc. ("DiSabatino") (docket item, "D.I.", 38) and T.V. Spano Building Corporation, Concord 2 Associates, Inc. and Thomas V. Spano ("the Spano defendants") (D.I. 41). The Spano defendants are the builder-developer of a residential development known as Raintree Village, which is located in White Clay Hundred in New Castle County, Delaware. Defendant DiSabatino was a subcontractor which worked on the Raintree Village project.

Plaintiffs are eight couples who purchased homes and currently reside in Raintree Village. By this action, plaintiffs seek to recover compensatory and punitive damages, to recover their putative "response costs", and assessment of civil penalties and certain other relief relating to the alleged contamination of the Raintree Village development during its construction and thereafter. Plaintiffs' claims are based on various Delaware statutory and common law theories, as well as a single claim based on the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 *et seq.*, as amended ("CERCLA"). Jurisdiction in this case is premised upon the sole "federal question" raised by the CERCLA claim, 28 U.S.C. § 1331.

Defendants' primary argument in support of their motions for summary judgment is that liability under CERCLA is inapposite where, as here, there has been

no disposal, release or threatened release of hazardous substances at Raintree Village. Plaintiffs respond generally that issues of fact remain and that summary judgment, therefore, should not be granted.

For the reasons that follow, the Court concludes that no genuine issues of material fact remain and that defendants are entitled to summary judgment as a matter of law.

## II. FACTS

The relevant facts are essentially undisputed and are taken from the parties' recitations of such.

### A. *Raintree Village*

Raintree Village is a residential subdivision consisting of lots for 97 single family homes, and is located in New Castle County near the Town of Christiana, Delaware. (D.I. 16A, Ex. 1) The land upon which Raintree Village is located was purchased in 1985 by defendant T.V. Spano Building Corporation and Concord 2 Associates, Inc. In 1986, those two entities began preparation for construction of Raintree Village.

Various subcontractors were employed for different jobs at the site. One of these subcontractors, defendant DiSabatino Bros., Inc., had the responsibility of preparing the site for construction. That preparation included the clearing of trees, brush and other vegetation from the site and the grading of the site. (D.I. 16A, Ex. 2)

### B. *Pre–Construction Meeting*

On April 4, 1986, at a pre-construction meeting conducted by the New Castle County Department of Public Works and involving representatives of defendant T.V. Spano Building Corporation and defendant DiSabatino Bros., Inc., it was approved by the County that site preparation debris would be buried within the Delmarva Power & Light Company ("DP & L") right-of-way which ran through the middle of the subdivision. (D.I. 16A, Ex. 1 at 2; Ex. 3)

Thereafter, construction commenced at Raintree Village in accordance with the plans approved at the pre-construction meeting. Site preparation debris, including tree stumps, tree limbs and other vegetation, were buried in trenches (hereinafter "disposal pits") within the DP & L right-of-way. (D.I. 16A, Ex. 4) Small amounts of construction debris (wood, plywood, empty paint cans and joint compound containers) were also buried in the disposal pits. (D.I. 16A, Ex. 4) After the disposal pits were filled, they were capped with a layer of earth.

### C. *Discovery of Methane*

On September 24, 1987, after about half of the homes had been finished and sold, including the homes of all of the plaintiffs, the Delaware Department of Natural Resources and Environmental Control ("DNREC") was called to Raintree Village to investigate the report of a flash ignition in the sump area of the basement of one home on Jonathan Drive. (D.I. 16A, Ex. 5 at 1) The DNREC tested the air in the basement of that home, as well as other homes on the same street. These tests detected the presence of methane gas in the basements of the homes and, as a precaution, DNREC ordered the temporary evacuation of three homes along Jonathan Drive. (D.I 16A, Ex. 5 at 1) Later the DNREC temporarily evacuated an additional nine homes on Jonathan Drive, and thereafter the entire subdivision, when a contractor hired by DNREC accidentally struck and ruptured a gas line in the development. (D.I. 16A, Ex. 5 at 3) Following the temporary evacuations, DNREC's initial response to the discovery of the methane was to install ventilation in the homes, to declare the emergency over and to allow the residents to return. (D.I. 16A, Ex. 5)

### D. *Governmental Response Actions*
#### 1. Investigation

A United States Environmental Protection Agency ("EPA") emergency response team was also involved in the initial preliminary investigation. After the residents returned to their homes, DNREC and the EPA conducted investigations to locate the source of the methane gas at Raintree Vil-

lage and to determine if any other gases or chemicals were present at the site.

EPA and DNREC determined that the methane gas was being emitted, at least in part, from the disposal pits in the DP & L right-of-way. (D.I. 16A, Ex. 6) Methane is ·a natural gas created by the decomposition of vegetative matter and is present in some amount in the types of soil found in the area in which Raintree Village is located. (D.I. 16A, Ex. 5) Microbes create methane as a by-product of their digestion and decomposition of vegetation in an oxygen-free (anaerobic) environment. (D.I. 16A, Ex. 8) However, the generation of methane from recently buried vegetative matter is unusual absent the introduction of significant amounts of bacteria from an outside source. Both DNREC and EPA detected fecal coliform in the disposal pits, indicating that raw sewage had infiltrated the disposal pits, possibly from a County sewer line which runs through the DP & L right-of-way. (D.I. 16A, Ex. 9) Although methane gas is lighter than air and dissipates quickly, in this case the methane travelled laterally through the site rather than venting into the atmosphere. This was due, in part, to the high clay content of the soil, which acted as a cap on the disposal pits. (D.I. 16A, Ex. 10 at 5)

The EPA conducted soil gas surveys in the Raintree Village site to identify the magnitude of the situation and locate a probable source of the methane gas. The soil vapors were monitored at 82 locations on the site; methane was detected at every location. The soil gas surveys also "identified the presence of organic chemicals in sufficient quantities to demonstrate that these vapors [were] emanating from man-made substances." (D.I. 16A, Ex. 11) The soil gas surveys performed at the site revealed as well the presence of certain substances identified as hazardous pursuant to CERCLA Section 101(14), 42 U.S.C. § 9601(14)[1] (benzene, toluene, ethylbenzene and xylene); the presence of these substances was deemed to be "in concentrations under 'action levels'." (D.I. 16A, Ex. 13; see also Ex. 14)

As part of its response to the soil gas surveys, EPA prepared a plan for the "Raintree Village Methane Site", which plan provided for the "excavation and dewatering" of several of the disposal pits, "where shredded and large trees, leaves, and other various construction debris had been landfilled." (D.I. 16A, Ex. 11) No substance other than methane is identified in this plan. (D.I. 16A, Ex. 11)

As part of its excavation process, the EPA analyzed samples from the disposal pits for toxicity, ignitability, corrosivity, and reactivity. The EPA concluded: "Since there are no listed hazardous wastes to our knowledge nor does the waste in the trenches exhibit the hazardous characteristics listed in 40 C.F.R. of the Federal Register, it is reasonable to assume that the materials to be excavated should not be considered hazardous waste and would therefore qualify for disposal" at a dry waste landfill in Delaware. (D.I. 16A, Ex. 21; see also Ex. 22) As part of the dewatering process, the EPA also analyzed the water being removed from the disposal pits to ensure that it did not contain hazardous

---

**1.** Section 101(14) reads as follows:

The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

substances. (D.I. 16A, Ex. 24) EPA received permission from New Castle County to discharge the water into the sanitary sewer system. (D.I. 16A, Ex. 25)

During the excavation of the debris, the DNREC and EPA prepared a detailed list of every item recovered from the disposal pits. (D.I. 16A, Ex. 4) The overwhelming volume of the material removed from the disposal pits consisted of trees, stumps and brush; small amounts of construction debris, $2 \times 4$'s, plywood, cardboard, carpeting, empty paint cans and empty joint compound buckets were also removed from two of the disposal pits, as were two bags of household garbage of unknown origin. Nothing removed was identified as a hazardous substance. At the end of the excavation process, the EPA representatives stated:

> All waste materials have been removed from the site and the threat (fire or explosion) has been abated. Therefore, we believe all remaining lots (including lot number 70) are not at risk and that all site contamination has been removed.

(D.I. 16A, Ex. 29) The EPA has not pursued a cost recovery action against any of the defendants to date.

## III. STATUTORY FRAMEWORK

Congress enacted CERCLA as a comprehensive response to the "increasingly serious problems of hazardous substance release", *United States v. Monsanto Co.*, 858 F.2d 160, 167 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), and to provide mechanisms "to force those responsible for creating [these] ... problems to bear the costs of their actions", *United States v. Hardage*, 761 F.Supp. 1501, 1508 (W.D.Okla.1990). Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that private party plaintiffs can recover certain costs from certain categories of individuals who are deemed responsible for the generation, transportation or disposal of hazardous substances. More specifically, CERCLA § 107(a) provides in pertinent part:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a ... facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility ... owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities ... or site selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607(a).

The language of this section "clearly defines the scope of intended liability and the elements of proof necessary to establish it." *United States v. Monsanto Co.*, 858 F.2d at 167. Certain of the requisite elements of the *prima facie* case under CERCLA § 107(a) relate to the site in general, while others relate to the individual defendants. With respect to the Raintree Village site, plaintiffs must establish that: 1) the site is a "facility"; 2) a release or threatened release of a hazardous substance from the site has occurred; and 3) the release or threatened release has caused plaintiffs to incur response costs. In addition, to complete the *prima facie* case against each defendant, plaintiffs must prove that each defendant falls within one of the classes of liable persons described in CERCLA § 107(a).

## IV. STANDARD OF REVIEW

 As stated by the Supreme Court, "[s]ummary judgment procedure is procedurally regarded, not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Federal Rule of Civil Procedure 56(c) provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Where, as here, plaintiffs have the burden of proof at trial on the issues for which summary judgment is sought, they must then make a showing sufficient to establish the existence of those elements essential to their case. "Only genuine disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *United States v. Hardage*, 761 F.Supp. at 1506. A dispute is "genuine" "if a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Although the Court must consider all inferences favorable to the nonmoving party which may be reasonably drawn from the evidence, *United States v. New Castle County*, 769 F.Supp. 591, 595 (D.Del.1991), "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the [factfinder] could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

## V. DISCUSSION

This Court in *Artesian Water Co. v. New Castle County*, 659 F.Supp. 1269 (D.Del.), *aff'd*, 851 F.2d 643 (3d Cir.1988), set out the essential elements of a *prima facie* claim for cost recovery under CERCLA § 107(a):

(1) [Defendants] must fall within one of the four categories of "covered persons." CERCLA § 107(a), 42 U.S.C. § 9607(a).

(2) There must have been a release or a threatened release of hazardous substances from the Site. [CERCLA] § 107(a)(4), 42 U.S.C. § 9607(a)(4); *see* [CERCLA] §§ 101(14), (22), 42 U.S.C. §§ 9601(14), (22).

(3) The release or threatened release must have caused [plaintiffs] to incur costs. [CERCLA] § 107(a)(4), 42 U.S.C. § 9607(a)(4).

(4) [Plaintiffs'] costs must be necessary costs of response. [CERCLA] § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B); *see* [CERCLA] §§ 101(23)—(25), 42 U.S.C. § 9601(23)—(25).

(5) [Plaintiffs'] response action must be consistent with the [n]ational [c]ontingency [p]lan. [CERCLA] § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B).

*Id.* at 1278–79.

As this Court recognized in the *Artesian* case, plaintiffs must establish *all* of these elements in order to recover under CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B). *Artesian Water Co.*, 659 F.Supp. at 1278.[2] For purposes of their motions for summary judgment, defendants must show that "there is no genuine issue of material fact as to the nonexistence of at least one of the five elements of

---

**2.** Defendants apparently concede that they are "person[s]", CERCLA § 101(21), 42 U.S.C. § 9601(21), and that the Raintree Village site is a "facility", CERCLA § 101(9), 42 U.S.C. § 9601(9). In this proceeding, defendants do not raise any of the CERCLA § 107(b) defenses.

[plaintiffs'] *prima facie* case...." *Id.* at 1279.

### A. *Covered Persons*

■ Section 107(a) of CERCLA sets out four categories of persons who may be held liable for the release of a hazardous substance:

 1) the owner and operator of ... a facility;

 2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of;

 3) any person who ... arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person ..., and

 4) any person who accepts or accepted any hazardous substance for transport to disposal or treatment facilities ... or sites selected by such person....

42 U.S.C. § 9607(a). Because the defendants concededly were not transporters of hazardous substances, they cannot be held liable under subsection (4) of CERCLA § 107(a), 42 U.S.C. § 9607(a). Subsection (1) applies to all *current* owners and operators of a facility "regardless of whether they owned or operated the facility when hazardous substances were disposed of there". *Artesian Water Co.*, 659 F.Supp. at 1280. Subsection (2) applies to former owners and operators, but only if they owned or operated the facility at the time of disposal of any hazardous substance. *Id. See also New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985); *United States v. Maryland Bank & Trust Co.*, 632 F.Supp. 573, 578 (D.Md.1986). Subsection (3) applies to any person who arranged for the disposal of hazardous substances at a facility.

The record indicates that none of the defendants are current "owners and operators" of the Raintree Village site; therefore, liability can be imposed only if defendants are "person[s] who at the time of *disposal of any hazardous substance* owned or operated any facility at which such hazardous substances were disposed of", 42 U.S.C. § 9607(a)(2), or are "person[s] who ... arranged for *disposal ... of hazardous substances* ... at any facility ...", 42 U.S.C. § 9607(a)(3). (Emphasis added) Thus, in order for the defendants to be "covered persons" under CERCLA, plaintiffs must show that "hazardous substances" were "disposed of" at Raintree Village.

It is undisputed that defendant DiSabatino disposed of the following materials into several disposal pits on the Raintree Village site: 1) site preparation debris (tree stumps and limbs and other vegetation); and 2) construction debris (wood, plywood, empty paint cans and joint compound containers). In order to discern whether such materials were "disposed of" for purposes of CERCLA, one is directed by CERCLA § 101(29), 42 U.S.C. § 9601(29), to refer to the Solid Waste Disposal Act (also referred to as the "Resource Conservation and Recovery Act", or "RCRA"), which defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste [3] or hazardous waste [4] into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

Plaintiffs apparently argue that the definition of "disposal" included in the Solid Waste Disposal Act, 42 U.S.C. § 6903(3), should be inserted wholesale into CERCLA's standard of liability, in effect eliminating the term "hazardous substance" from CERCLA § 107, 42 U.S.C. § 9607, and substituting in its place the

---

**3.** "The term 'solid waste' means any garbage, refuse, ... and other discarded material ... from industrial, commercial, mining, and agricultural operations, and from community activities...." 42 U.S.C. § 6903(27).

**4.** "Hazardous waste" is defined as a "solid waste, or combination of solid wastes, which

because of its quantity, concentration, or physical, chemical, or infectious characteristics may ... pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed." 42 U.S.C. § 6903(5).

terms "hazardous waste" and "solid waste", as used in 42 U.S.C. § 6903(3) and defined in 42 U.S.C. § 6903(5) and (27), respectively. Thus, if a person placed a solid or hazardous waste into the land so that it or a constituent thereof could enter the environment, said person arguably could be held liable under CERCLA for response costs. The problem with this analysis, of course, is that liability under CERCLA is grounded on the disposal of a "hazardous substance", a term which is specifically defined in CERCLA § 101(14), 42 U.S.C. § 9601(14); significantly, CERCLA's definition of "hazardous substance" refers to "any hazardous waste having the characteristics identified under or listed pursuant to § 3001 of the Solid Waste Disposal Act", 42 U.S.C. § 6921. According to regulations promulgated pursuant to that section, a "hazardous waste" is identified by four characteristics: 1) ignitability; 2) corrosivity; 3) reactivity; and 4) toxicity. 40 C.F.R. §§ 261.20–24. There is no evidence of record that, at the time of disposal, the materials buried by defendant DiSabatino presently exhibited any of the characteristics of a hazardous waste, as the latter term is defined in 42 U.S.C. § 9601(14)(C).

Plaintiffs refer the Court to the analysis of the Delaware Superior Court in *T.V. Spano Bldg. Corp. v. Wilson*, 584 A.2d 523 (Del.Super.1990), in support of their position that defendants are liable under CERCLA for the disposal of hazardous waste. The state court, in reviewing the findings of Delaware's Environmental Appeals Board, concluded that *"hazardous waste* had been disposed of at the development known as Raintree Village", *id.* at 527 (emphasis added):

> TVSBC contends that the Order is invalid because the tree debris that was placed in the pit was not hazardous waste. Hazardous waste is defined as: "A solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical or infectious characteristics may ... pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported or disposed of, or otherwise managed." 7 Del.C. § 6302(7). Solid waste is broadly defined as: "Any garbage, refuse, ... and other discarded materials...." 7 Del.C. § 6302(12).

> The Order made certain *preliminary findings* that are pertinent to the nature of the substances buried at the development:

> (1) a significant amount of solid and other waste was found to have been improperly disposed of at the development;

> (2) solid and other waste is known to generate methane gas during decomposition;

> (3) solid and other waste was found to be buried under portions of properties of the affected homes;

> (4) methane is known to migrate from its place of origin by way of underground water and volatilizing and diffusing through soil;

> (5) methane resulting from decomposition of solid and other waste was found at or in excess of the lower explosive limit in basements of 12 homes in the development;

> (6) the presence of methane at the development in concentrations at or in excess of the lower explosive level poses an imminent and substantial hazard to the public health and the environment;

> (7) solid and other waste was found buried in contact with the groundwater underlying the development and caused contamination of the groundwater at the development.

> Although these findings do not use the words "hazardous waste," the findings do embody the requisites set forth in the definition of "hazardous waste" expressed in 7 Del.C. § 6302(7). These findings are supported by substantial evidence.

*Id.* (emphasis added). At the outset, it is evident from the state court decision that the findings reviewed were preliminary; the decision rendered, therefore, was not

final as to the nature of the substances involved.[5]

Plaintiffs assert, however, that the state court "construed a provision of Delaware law identical to *RCRA*'s statutory definition of '*hazardous waste*,' 7 Del.C. § 6302(12), to apply directly to the activities of defendants at the site." (D.I. 44 at 5–6) (emphasis added). Again plaintiffs apparently fail to appreciate that their action at bar to recover response costs from the defendants is not grounded on the federal equivalent to the state act construed (i.e., the Solid Waste Disposal Act or RCRA), but is grounded on CERCLA, a federal act which employs language different than that employed under RCRA, presumably for a purpose. *Cf. Hassayampa Steering Committee v. Arizona*, 942 F.2d 791 (Table), 1991 WL 159823 at 6–7, 1991 U.S.App. LEXIS 19727 at 4–5 (9th Cir.1991); *United States v. Pesses*, 794 F.Supp. 151, 155–156 (W.D.Pa.1991), *corrected, adopted, partial summ. judgment granted*, 794 F.Supp. 151 (W.D.Pa.1992); *Nurad, Inc. v. Wm. E. Hooper & Sons Co.*, 1991 WL 353267, 1991 U.S.Dist. LEXIS 17090 (D.Md.1991) at 52–3, *aff'd in part and rev'd in part*, 1992 U.S.App. LEXIS 12166 (4th Cir.1992); *Westwood Pharmaceuticals v. National Fuel Gas Dist. Corp.*, 737 F.Supp. 1272, 1278–79 (W.D.N.Y.1990), *aff'd*, 964 F.2d 85 (2d Cir.1992).

Plaintiffs' reliance on *Ametek, Inc. v. Pioneer Salt & Chemical Co.*, 709 F.Supp. 556, 559 (E.D.Pa.1988), likewise is misplaced. The court in *Ametek* properly referred to 42 U.S.C. § 6903(3) to define the term "disposal" for purposes of CERCLA, but looked to CERCLA itself for the definition of "hazardous substance". Indeed, there was no dispute in *Ametek* as to whether the substance at issue was hazardous under the definition contained in CERCLA § 101(14), 42 U.S.C. § 9601(14). *See also Westwood Pharmaceuticals v. National Fuel Gas Dist. Corp.*, 737 F.Supp. at 1279.

The record indicates that no "hazardous substances" were "disposed of" at Raintree Village, and that there is no genuine issue as to this material fact. Thus, plaintiffs have failed to adduce evidence supporting their contention that defendants are "covered persons" under CERCLA.

B. *Release or Threatened Release*

■ Even assuming that plaintiffs raised a genuine issue of material fact as to whether defendants are covered persons under CERCLA, which plaintiffs have not done, plaintiffs still must demonstrate that there has been a release or threatened release of hazardous substances from the Raintree Village site. In support of their position that hazardous substances were released, plaintiffs again refer to the analysis embraced by the Delaware Superior Court in its review of the state provisions regulating "hazardous waste management", 7 Del.C. §§ 6301 *et seq. T.V. Spano Building Corp. v. Wilson*, 584 A.2d at 527. For the reasons stated above, the Court finds that decision uncompelling. Plaintiffs argue as well that the "governmental actions to date, which include Delaware's suing Spano for disposing of hazardous waste, and EPA's remedial actions under CERCLA, reflect the governmental agencies' agreement with" plaintiffs' contentions. (D.I. 44 at 9)

Apparently there is no dispute that methane gas was "released", as the latter term is defined under CERCLA § 101(22), 42 U.S.C. § 9601(22).[6] Plaintiffs misplace their reliance on the federal government's response action, however, in identifying methane gas as a hazardous substance. As explained by the EPA in its January 23, 1986 policy directive,

> [b]ecause methane gas is not listed or designated under any of the statutory provisions in section 101(14) of CERCLA [42 U.S.C. § 9601(14)], it is not a "hazardous substance." However, response actions under CERCLA section 104 [42

---

5. It is instructive to note in passing that the only substance identified by the state court as being released is methane gas.

6. "Release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment...." 42 U.S.C. § 9601(22).

U.S.C. § 9604] are not limited to hazardous substances. Section 104(a)(1) authorizes responses to actual or potential releases of "pollutants or contaminants." ... [Releases of] methane gas emanating from a landfill ... may therefore be eligible for response under section 104(a)(1) if methane gas otherwise meets the definition of pollutant or contaminant under section 104(a)(2).... Although ... [a] removal action is authorized under CERCLA section 104(a)(1), the responsible party may not be liable under section 107 [42 U.S.C. § 9607] for removal action costs since liability under that section is limited to releases of hazardous substances.

(D.I. 56)

Despite the EPA's position that methane gas is "not listed or designated under *any* of the statutory provisions" of CERCLA § 101(14), 42 U.S.C. § 9601(14) (emphasis added) and that methane gas is not a hazardous substance, plaintiffs apparently maintain that the methane gas generated at the Raintree Village site is a CERCLA "hazardous substance" because methane allegedly is a "hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921]...." *See* 42 U.S.C. § 9601(14). More specifically, it appears that plaintiffs are alleging that methane gas is a "hazardous waste" having the characteristic of "ignitability" as those terms are defined in RCRA and regulations promulgated pursuant to that Act. A "hazardous waste" having the characteristic of "ignitability" is defined, in part, under 42 U.S.C. § 6921 and 40 C.F.R. § 261.21(a)(2) as follows: "A *solid waste* exhibits the characteristic of ignitability if a representative sample of the waste has any of the following properties...." (Emphasis added). Consistent with the EPA's interpretation, the Court concludes that the definition of ignitability, as provided in 40 C.F.R. § 261.21(a)(2), is confined in its application to solid waste; it simply makes no sense to apply the characteristics of a solid waste to a gas. There can be no dispute that methane gas is not a solid waste.[7]

Although not directly on point, the opinion rendered in *United States v. Serafini*, 750 F.Supp. 168 (M.D.Pa.1990), is instructive. Defendant in *Serafini* was sued for the recovery of response costs by virtue of its disposing of "scrap" from its manufacturing operation. While defendant's "scrap" is not included on the federal government's list of hazardous substances, when the scrap is burned, it releases various substances which are on the 42 U.S.C. § 9601(14) list. The plaintiff argued that because defendant "knew or should have known that fires were common at dumps in the 1960's and the 1970's, disposing of this scrap at the [site in question] was tantamount to disposal of 'hazardous substances'." *Id.* at 170. The court, while acknowledging CERCLA's broad remedial purpose, rejected plaintiff's argument:

> In light of the statutory scheme created by CERCLA, this Court concludes that Congress intended that EPA determine whether liability should attach to the disposal of a substance on a substance by substance basis. The definition of "hazardous substance" and § 102 (42 U.S.C. § 9602) allow EPA to determine what substances pose a sufficient danger to the public to be included on the hazardous substance list....
>
> The expansion of the definition of hazardous substance to include all materials which when burned release listed hazardous substances is a matter for the consideration of Congress. Rather than including all such substances on the list, Congress has allowed EPA to consider the potential danger to the public health, welfare, and the environment. 42 U.S.C. § 9602. Such factors as the likelihood that the substance will burn, the likelihood that hazardous materials will be

---

7. EPA regulations promulgated pursuant to RCRA indicate that "all materials are either: (1) Garbage refuse, or sludge; (2) solid, liquid, semi-solid or contained gaseous material; or (3) something else. No materials in the third category are solid waste." 42 C.F.R. Pt. 260, App. I. It is clear that the migrating methane gas found at the Raintree Village site is not "[g]arbage refuse, or sludge", nor is it a "solid, liquid, semi-solid or contained gaseous material." *See Id.* Therefore, methane gas must fall into the category of "something else" and the regulations clearly state that "[n]o materials in the [something else] category are solid waste." *See Id.*

**1130**

released in the event the substance burns, and the amount of hazardous material that is likely to escape into the environment in the event of a fire may all play a role in EPA's decision as to whether a substance belongs on the hazardous substance list.

*Id.* at 171.

Plaintiffs argue rather vaguely that "[d]efendants' assertion that EPA's representation that debris excavation 'post-release' was not a 'hazardous waste' can be readily dismissed. The condition of the soil after the release of gases and chemicals is obviously not dispositive on the question of what substances were released." (D.I. 44 at 9) Plaintiffs cite in support of this contention *Transportation Leasing Co. v. California,* 32 E.R.C. 1499 (C.D.Cal.1990), which appears to stand for the proposition that, in order to establish liability, "plaintiffs must prove that the waste disposed of ... contained 'hazardous substances' under CERCLA." The Court agrees and finds that plaintiffs, after the completion of discovery, have failed to adduce any evidence which raises genuine issues of material fact as to the substances released from the Raintree Village site or the nature of such substances.[8]

## VI. CONCLUSION

For the reasons stated, this Court finds that there are no genuine issues of material fact as to the identification of the substances disposed of and released from the Raintree Village site. The Court further finds, as a matter of law, that the disposal of site preparation and construction debris on the Raintree Village site does not consti-

tute the disposal of hazardous substances under CERCLA § 107(a)(2), (3), (4), 42 U.S.C. § 9607(a)(2), (3), (4), and that the release of methane gas from the Raintree Village site does not constitute the release of a hazardous substance under CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4).[9] Plaintiffs, therefore, have failed to carry their burden of proof under CERCLA § 107, 42 U.S.C. § 9607, and defendants are entitled to entry of a summary judgment in their favor. With dismissal of the federal claim, this Court declines to accept pendent jurisdiction over plaintiffs' remaining state law claims.

An Order consistent with this Memorandum Opinion shall issue.

---

**8.** Although there are some references to the release of listed hazardous substances, these references constitute a "mere scintilla of evidence insufficient for a jury reasonably to find for plaintiffs". Specifically, EPA soil gas surveys conducted at the Raintree Village site revealed the presence of benzene, toluene, ethylbenzene and xylene "in concentrations under 'action levels'." (D.I. 16A, Ex. 13; *see also* Ex. 14) The record does not include any evidence indicating how or when these hazardous substances became present at the Raintree site. Plaintiffs have not adduced any evidence showing that defendants "owned or operated" the Raintree site at a time when these or any other hazardous substances "were disposed of" at Raintree. *See* 42 U.S.C. § 9607(a)(2). Furthermore, plaintiffs

have not produced any evidence indicating that defendants "arranged for disposal" of these hazardous substances at the Raintree site. *See* 42 U.S.C. § 9607(a)(3). Therefore, even if it is assumed that this "scintilla" of evidence supports plaintiffs' contention that hazardous substances were released at the Raintree Village site, plaintiffs nonetheless have failed to raise a genuine issue as to whether defendants are "covered persons" under CERCLA.

**9.** In light of plaintiffs' burden to prove *all* the elements of a CERCLA § 107 *prima facie* case, the Court need not address the remaining elements.