425 S.E.2d 144

Eddie **BOWLING**, Kenneth Bowling, Mary E. Lopez, Alice West, Darrell G. Rakes, Elizabeth E. Epperson, Carol Jean Carte, Pamela L. Toney, Terry G. Rahn, Franklin A. Comer, Dorothy M. McCoy, John Bennett, Gregory J. Harding, Steven W. Pack, Barbara J. Hull, Roy L. Willis, and Luther E. Toney, Plaintiffs Below, Appellants,

v.

**ANSTED CHRYSLER–PLYMOUTH– DODGE, INC.**, and David Akers, Defendants Below,

**David Akers, Appellee.**

**No. 20994.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 1992.

Decided Dec. 11, 1992.

Ralph C. Young, Hamilton, Burgess, Young, Tissue & Pollard, Oak Hill, for appellants.

James M. Brown, File, Payne, Scherer & Brown, Beckley, for appellee.

MILLER, Justice:

This appeal is brought by twenty-one plaintiffs who filed seventeen separate civil actions in the Circuit Court of Fayette County against Ansted Chrysler–Plymouth–Dodge, Inc., an automobile dealership, and the dealership's president, David Akers.[1] The plaintiffs alleged that the vehicles sold to them by the dealership and Mr. Akers were fraudulently misrepresented to be "demonstrators" when they were actually used rental cars.

The cases were consolidated for trial. At the close of the evidence, the trial court directed a verdict for the defendant David Akers. The common law fraud case against the dealership was submitted to the jury, which rendered a verdict for all seventeen plaintiffs. The jury further found that an award of punitive damages was inappropriate. Based on this latter finding, the trial court refused to award the plaintiffs attorney's fees.

On appeal, the plaintiffs assign two errors: (1) the trial court erred in directing a verdict for Mr. Akers, and (2) the trial court should have awarded the plaintiffs reasonable attorney's fees. We agree on both counts; accordingly, we remand the case for further proceedings consistent with this opinion.

## I.

## FACTS

The automobile dealership is a West Virginia corporation with places of business in Ansted and Fayetteville. In the fall of 1986, defendant David Akers and Rick Bonham purchased the dealership. Initially, Mr. Bonham was in charge of the day-to-day operations of the dealership, and Mr. Akers was merely an investor. In February of 1988, Mr. Bonham sold his interest in the dealership to Mr. Akers. Subsequently, Mr. Akers became the president of the company and owned 60 percent of the stock. The remaining stock was owned by Mr. Akers' brother, who is not involved in the operation of the business.

Shortly thereafter, Mr. Akers began purchasing "factory cars" at commercial auctions in Ohio, North Carolina, and Pennsylvania. Ninety percent of the vehicles sold at these auctions were rental cars.[2] The remaining ten percent were leased vehicles, Chrysler company cars, or new vehicles that had been damaged during shipment from the factory. Mr. Akers purchased sixteen of the vehicles involved in this litigation at one of these auctions. The remaining vehicle was purchased at a private treaty sale. Such vehicles are purchased by the truckload directly from the car rental agency.

After purchasing these vehicles, Mr. Akers would arrange to have them transported to either his Ansted or Fayetteville car lot. On arrival, the cars were thoroughly cleaned, all fluids were checked or changed, and any decals or other evidence that the car had been a rental car were removed. The cars were then advertised in local newspapers as "factory cars" or "fresh from factory sale" cars and offered for resale at a profit margin greater than a dealer would realize on the sale of an identical new car. Both car lots had signs advertising that they were "factory outlets." During trial, Mr. Akers acknowledged that this advertising was misleading because most potential car buyers would not suspect that "factory cars" were in reality used rental cars.

Four of Mr. Akers' salesmen sold sixteen of the vehicles involved in this litigation. In each case, the salesman told the plaintiff that the vehicle he purchased had been a "demonstrator" or "demo" and that this

---

1. Ansted Chrysler–Plymouth–Dodge, Inc., did not participate in this appeal.

2. Among the rental car companies who previously owned the vehicles purchased by Mr. Akers were Avis, Budget Rental Company, and Hertz.

limited use accounted for the mileage on the odometer. One plaintiff, Darrell Rakes, testified that Mr. Akers told him that the car he eventually purchased was a "factory demo." Mr. Akers denied making this statement. Some of the plaintiffs were told that the cars they purchased had been driven by employees of the dealership, while others were led to believe that their cars had been driven by Chrysler executives. One plaintiff was told that her vehicle had been driven by a high school valedictorian for a year following graduation.

The remaining car was purchased by Gary and Greg Harding, father and son. Greg Harding testified that Mr. Akers had sold him his car and that Mr. Akers had told him that the vehicle was a "demo." In reality, the car had been damaged in transit and repaired. Upon further investigation, the Hardings realized that the serial number on their sales receipt and on the car's title did not match the serial number on the vehicle. Moreover, only 98 miles were reflected on the car's odometer when the Hardings purchased the vehicle from the dealership, while the title received by Mr. Akers at the commercial auction stated that the car's mileage was 14,114.

In this regard, Mr. Akers testified that the discrepancy in the paperwork and his failure to tell the Hardings that the car had been damaged were honest errors. He explained that when he purchased the Harding vehicle, he also bought a second car which was very similar. When he was finalizing the sale with the Hardings, Mr. Akers testified that he inadvertently pulled the file for the similar vehicle.

Every plaintiff also obtained his or her financing from the dealership. Some of the retail installment sales contracts identified the cars as new. The plaintiffs whose sales contracts stated that the car was used believed that this designation was required because the vehicle had been a "demonstrator." In several cases, the contracts falsely certified that the vehicle was being sold by Chrysler Corporation rather than by the actual previous owner, a car rental agency. The contracts frequently recited an inflated value for the car the customer traded in or a deflated price for the vehicle sold. These practices benefited the dealership when the customer was told the sales price included West Virginia sales tax.[3] Mr. Akers signed the financing documents in sixteen of the cases involved.

All the plaintiffs testified that they were not interested in purchasing a rental car, or, in the Harding case, a vehicle that had been damaged. Moreover, each plaintiff stated that he or she would not have purchased the car for the agreed price had the vehicle's history not been misrepresented.

The first lawsuit against the defendants was filed by Eddie and Mary Bowling. Shortly thereafter, an article appeared in the local newspaper reiterating some of the allegations in the Bowlings' complaint. Mr. Akers responded by writing a letter to the editor defending his sales practices and assuring the local readership that he was "totally responsible for all my service and sales staff." Indeed, Mr. Akers testified at trial that his dealership was the smallest in Fayette County, and he boasted that he knew everything that happened in the business.

Thereafter, the Bowlings' attorney filed the remaining sixteen lawsuits. All of the complaints alleged common law fraud, a violation of the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and a violation of the West Virginia Consumer Credit and Protection Act, W.Va.Code, 46A–1–101, *et seq.*

The cases were consolidated for trial, and the plaintiffs proceeded exclusively on the fraud actions. At the close of all the evidence, the trial court granted a directed verdict for Mr. Akers. The jury rendered a verdict against the dealership for all seventeen plaintiffs. The jury further found that the plaintiffs should be allowed to rescind their sales contracts.

---

**3.** According to the record, sales tax is assessed based on the difference between the sales price and the value of the trade-in. By inflating the trade-in value or lowering the price of the car being sold, the dealership reduced the amount of tax it owed the State.

After returning a compensatory damage verdict for the plaintiffs, the jury heard further arguments on the issue of punitive damages, but refused to award them. The plaintiffs then moved the court for an award of attorney's fees, and the dealership moved for a judgment notwithstanding the verdict, or, in the alternative, for a remittitur based on the depreciation of the vehicles from the time of purchase until the time of trial. The trial court denied all of the motions. The plaintiffs now appeal.

## II.

## DIRECTED VERDICT

■ With regard to the directed verdict for the defendant, Mr. Akers, on the plaintiffs' claim that as an officer of the corporation, he is personally liable, we apply our standard set out in Syllabus Point 1 of *Elkins Manor Associates v. Eleanor Concrete Works, Inc.*, 183 W.Va. 501, 396 S.E.2d 463 (1990):

" 'Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence.' Syllabus, *Nichols v. Raleigh–Wyoming Coal Co.*, 112 W.Va. 85, 163 S.E. 767 (1932)."

*See also Cale v. Napier*, 186 W.Va. 244, 412 S.E.2d 242 (1991); *Rodgers v. Rodgers*, 184 W.Va. 82, 399 S.E.2d 664 (1990); *Hess v. Arbogast*, 180 W.Va. 319, 376 S.E.2d 333 (1988); *Jividen v. Legg*, 161 W.Va. 769, 245 S.E.2d 835 (1978). Thus, we must construe the evidence in the light most favorable to the plaintiffs.

■ The plaintiffs proceeded on the theory that both the dealership and Mr.

Akers had engaged in fraud. In Syllabus Point 2 of *Muzelak v. King Chevrolet, Inc.*, 179 W.Va. 340, 368 S.E.2d 710 (1988), we explained the proof required in a fraud action:

" 'The essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.' Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981)."

These elements must be proved by clear and convincing evidence. *See C.W. Dev., Inc. v. Structures, Inc., of W. Va.*, 185 W.Va. 462, 408 S.E.2d 41 (1991); *Cardinal State Bank Nat'l Ass'n v. Crook*, 184 W.Va. 152, 399 S.E.2d 863 (1990); *Muzelak v. King Chevrolet, Inc., supra; Romano v. New England Mut. Life Ins. Co.*, 178 W.Va. 523, 362 S.E.2d 334 (1987); *Brown v. Crozer Coal & Land Co.*, 144 W.Va. 296, 107 S.E.2d 777 (1959).

■ We recognized in *Cato v. Silling*, 137 W.Va. 694, 717, 73 S.E.2d 731, 745 (1952), *cert. denied*, 348 U.S. 981, 75 S.Ct. 572, 99 L.Ed. 764 (1955), that an officer of a corporation is not personally liable for the corporation's torts unless he directed, sanctioned, or participated in the wrongful acts, including fraud: "A director or an officer of a corporation does not incur personal liability for its torts merely by reason of his official character unless he has participated in or sanctioned the tortious acts[.]" [4] (Citation omitted). *See also Mullins v. Venable*, 171 W.Va. 92, 297 S.E.2d 866 (1982). *Cf. State v. Childers*, 187 W.Va. 54, 415 S.E.2d 460 (1992) (officers and directors may be criminally liable

---

**4.** "This rule does not depend on the same grounds as 'piercing the corporate veil,' that is, inadequate capitalization, use of the corporate form for fraudulent purposes, or failure to comply with the formalities of corporation organization." *Crigler v. Salac*, 438 So.2d 1375, 1380 (Ala.1983). (Citation omitted). *See also Riverside Mkt. Dev. v. International Bldg. Prods.*, 931 F.2d 327 (5th Cir.), *cert. denied sub nom., Riverside Mkt. Ltd. Partnership v. Prescott*, —— U.S.

——, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991); *United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *Smith v. Hawks*, 182 Ga.App. 379, 355 S.E.2d 669 (1987); *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532 (Tex. App.1989). Our leading case on piercing the corporate veil is *Laya v. Erin Homes, Inc.*, 177 W.Va. 343, 352 S.E.2d 93 (1986).

if they cause the corporation to violate the criminal law while conducting corporate business). This is also the general rule elsewhere. *See, e.g., Camron v. Outdoor Resorts of Am.*, 611 F.2d 105 (5th Cir.1980) (applying Florida law); *Crigler v. Salac*, 438 So.2d 1375 (Ala.1983); *Klockner v. Keser*, 29 Colo.App. 476, 488 P.2d 1135 (1971); *Meehan v. Adams Enters., Inc.*, 211 Kan. 353, 507 P.2d 849 (1973); *McCain Foods, Inc. v. St. Pierre*, 463 A.2d 785 (Me.1983); *Oysterberger v. Hites Constr. Co.*, 599 S.W.2d 221 (Mo.App.1980); *People v. Apple Health & Sports Club, Ltd.*, 80 N.Y.2d 803, 587 N.Y.S.2d 279, 599 N.E.2d 683 (1992). The Kansas court summarized an officer's personal liability in *State ex rel. Stephan v. Commemorative Services Corp.*, 16 Kan.App.2d 389, 400, 823 P.2d 831, 840 (1991):

"An officer of a corporation is personally liable for wrongful actions of that corporation if he approved or sanctioned the action. He is liable if he is personally guilty of making false representations as to material matters in connection with the corporation's actions. He is personally liable if he willingly participated in acts of fraud and deceit."

*See generally* 18B Am.Jur.2d *Corporations* § 1877 (1985 & Supp.1992); Annot., 90 A.L.R.3d 916 (1979 & Supp.1992). Thus, we conclude that an officer of a corporation may be personally liable for the tortious acts of the corporation, including fraud, if the officer participated in, approved of, sanctioned, or ratified such acts.

■ Mr. Akers argues that because in fifteen of the seventeen cases there is no evidence that he directly told the customers that the vehicles were "demonstrators" or that he told his salesmen to misrepresent the car's history, he is relieved of liability. We believe Mr. Akers defines the word "sanction" far too narrowly.

■ In sanctioning a fraudulent act, the officer need not have actual knowledge because constructive knowledge may suffice. *T.V. Spano Bldg. Corp. v. Wilson*, 584 A.2d 523 (Del.Super.1990); *Oysterberger v. Hites Constr. Co., supra; Wolfersberger v. Miller*, 327 Mo. 1150, 39 S.W.2d 758 (1931).

This knowledge does not have to be shown by direct evidence and usually can only be proved by circumstantial evidence. *Bank of Coushatta v. Patrick*, 503 So.2d 1061 (La.App.), *writ denied*, 506 So.2d 1231 (La. 1987); *Watson v. Harris*, 435 S.W.2d 667 (Mo.1968). The circumstantial evidence may include evidence of similar transactions in the course of a systematic way of doing business. *Blakeley v. Bradley*, 281 S.W.2d 835 (Mo.1955). This rule is summarized in 3A *Fletcher's Cyclopedia of Corporations* § 1135 at 267 (Perm. ed. 1986), which we find consistent with our law:

"In other words, corporate officers, charged in law with affirmative official responsibility in the management and control of the corporation business, cannot avoid personal liability for wrongs committed by claiming that they did not authorize and direct that which was done in the regular course of that business, with their knowledge and with their consent or approval, or such acquiescence on their part as warrants inferring such consent or approval." (Footnote omitted).

*See also Teledyne Indus., Inc. v. Eon Corp.*, 401 F.Supp. 729 (S.D.N.Y.1975), *aff'd sub nom., Teledyne Indus., Inc. v. Podell*, 546 F.2d 495 (2d Cir.1976) (applying California law); *Crigler v. Salac, supra; T.V. Spano Bldg. Corp. v. Wilson, supra; Osborne v. Hey*, 284 Or. 133, 585 P.2d 674 (1978).

A review of the record leads us to conclude that there was sufficient direct and circumstantial evidence presented from which a reasonable jury could have concluded that Mr. Akers sanctioned and participated in the fraudulent scheme. Mr. Akers purchased the cars at commercial auctions with full knowledge that most of them were used rental cars. When these vehicles were brought to West Virginia, all evidence that they had been used rental cars was carefully removed. The vehicles were advertised as "factory cars" or "fresh from the factory sale" cars, and the car lots were described as "factory outlets." Mr. Akers conceded at trial that these terms would likely mislead the average

consumer. He also admitted at trial that he was the one who conceived of the scheme to sell "factory cars."

Mr. Akers further testified that he had a small dealership and that he was fully aware of everything that happened in his business. He assured the people of Fayette County in a letter to the editor of the local newspaper that he was totally responsible for the sales and service provided at the dealership. He signed sixteen of the installment contracts, many of which recited information that Mr. Akers either knew or should have known was false. Finally, there was direct testimony by two of the plaintiffs that Mr. Akers misrepresented their cars' histories. This evidence could lead a reasonable jury to conclude that Mr. Akers knew, approved, and sanctioned the fraudulent scheme and, thus, find him personally liable for fraud.

When considering the evidence in light of the standard we set forth in the Syllabus of *Elkins Manor Associates v. Eleanor Concrete Works, Inc., supra,* we find that the trial court erred in directing a verdict for Mr. Akers. Accordingly, we reverse the judgment of the Circuit Court of Fayette County and remand the case for a new trial against Mr. Akers.

## III.

### ATTORNEY'S FEES

■ The plaintiffs further argue that the trial court erred in denying their motion for attorney's fees. The trial court reasoned that attorney's fees could not be awarded in a fraud action where the jury did not assess punitive damages. We disagree; therefore, we remand the case with instructions that the trial court enter an order requiring the dealership to pay the plaintiffs reasonable attorney's fees.

In Syllabus Point 2 of *Sally–Mike Properties v. Yokum,* 179 W.Va. 48, 365 S.E.2d 246 (1986), we stated: "As a general rule each litigant bears his or her own attor-

ney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." *See, e.g., Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Yost v. Fuscaldo,* 185 W.Va. 493, 408 S.E.2d 72 (1991); *Hechler v. Casey,* 175 W.Va. 434, 333 S.E.2d 799 (1985); *Daily Gazette Co. v. Canady,* 175 W.Va. 249, 332 S.E.2d 262 (1985). *See generally* S. Speiser, *Attorneys' Fees* § 12.3 (1st ed. 1973 & Supp.1991). This rule, known as the American Rule, has been subjected to a number of exceptions. *See* S. Speiser, *supra* §§ 13.1–13.33.

We adopted one of these exceptions in *Nelson v. West Virginia Public Employees Insurance Board,* 171 W.Va. 445, 451, 300 S.E.2d 86, 92 (1983):

"A well established exception to the general rule prohibiting the award of attorney fees in the absence of statutory authorization, allows the assessment of fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *See, e.g., Alyeska Pipeline Service Co. v. Wilderness Society,* [*supra*]; *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962); *see also, Annot.,* 31 A.L.R.Fed. 833 (1977)."

*See also Yost v. Fuscaldo, supra; Muzelak v. King Chevrolet, Inc., supra; Sally–Mike Properties, Inc. v. Yokum, supra;*[5] *Daily Gazette Co. v. Canady, supra.* " 'Bad faith' may be found in conduct leading to the litigation or in conduct in connection with the litigation. *Hall v. Cole,* 412 U.S. 1, 15, 93 S.Ct. 1943, 1951, 36 L.Ed.2d 702, 713 (1973)." *Sally–Mike Properties, Inc. v. Yokum,* 179 W.Va. at 51, 365 S.E.2d at 249. *See also Yost v. Fuscaldo, supra.*

Recently, in *Yost v. Fuscaldo,* we addressed an issue similar to the one raised in this case. Mr. Yost was severely injured while operating a machine for his employer. Because the company's workers' compensation coverage had lapsed, Mr. Yost

---

**5.** In Syllabus Point 3 of *Sally–Mike Properties,* we explained: "There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons."

was not precluded from filing suit against his employer, and he did so. Subsequently, Mr. Yost added three additional defendants: the seller of the machine, the mechanical engineer who reassembled and installed the machine, and the machine's manufacturer.

Before trial, Mr. Yost signed releases absolving the four defendants of liability. Later, Mr. Yost alleged that the releases were fraudulently obtained. A trial was held to determine the validity of the releases. A jury found that the defendants had fraudulently induced Mr. Yost to execute the documents. Following the jury verdict, Mr. Yost argued that he was entitled to attorney's fees. The trial court denied this request.

On appeal, we specifically addressed "whether a finding of fraud is considered an action in 'bad faith, vexatiously, wantonly, or for oppressive reasons' sufficient to permit the award of attorney fees. [*Nelson v. West Virginia Public Employees Ins. Bd.*, 171 W.Va. at 451] 300 S.E.2d at 92." *Yost v. Fuscaldo*, 185 W.Va. at 500, 408 S.E.2d at 79. After reciting the "bad faith" exception to the American rule, we concluded that the defendants' actions were "oppressive and wanton, and should be discouraged." *Yost v. Fuscaldo*, 185 W.Va. at 500, 408 S.E.2d at 79. Accordingly, we ruled that the plaintiff should be reimbursed by the defendants for the attorney's fees he incurred in litigating the fraud action.

Other courts have also found that fraud falls within the "bad faith" exception to the American rule. As was aptly stated by the Court of Appeals for the Eleventh Circuit in *Cook v. Deltona Corp.*, 753 F.2d 1552, 1564 (11th Cir.1985): "If the party seeking fees can demonstrate the specific, certain and conclusive existence of malice or fraud, attorneys' fees are available." (Citation omitted). *See also Schlein v. Smith*, 160 F.2d 22 (D.C.Cir.1947); *Kuniansky v. D.H. Overmyer Warehouse Co.*, 406 F.2d 818 (5th Cir.1968), *cert. denied*, 398 U.S. 905,

90 S.Ct. 1697, 26 L.Ed.2d 64 (1970) (applying Georgia law); *Reynolds v. First Alabama Bank of Montgomery*, 471 So.2d 1238 (Ala.1985); *Gabaig v. Gabaig*, 717 P.2d 835 (Alaska 1986); *Baya v. Central & So. Fla. Flood Control Dist.*, 184 So.2d 501 (Fla.App.1966); *Estate of Kerns*, 802 P.2d 1298 (Okla.App.1990); *Matter of Guardianship & Estate of P.A.H.*, 115 Wis.2d 670, 340 N.W.2d 577 (1983). The foregoing cases comport with our finding in *Yost v. Fuscaldo, supra.* As we observed in *Quality Bedding Co. v. American Credit Indemnity Co. of New York*, 150 W.Va. 352, 359, 145 S.E.2d 468, 474 (1965): "Fraud in the popular understanding of the term involves an element of moral turpitude or bad faith." *Quoting Kuhn v. Chesapeake & Ohio Ry. Co.*, 118 F.2d 400, 405 (4th Cir.1941).

■ Consequently, we conclude that where it can be shown by clear and convincing evidence that a defendant has engaged in fraudulent conduct which has injured a plaintiff, recovery of reasonable attorney's fees may be obtained in addition to the damages sustained as a result of the fraudulent conduct. The plaintiffs here made such a showing against the dealership, and, therefore, the trial court should have awarded them reasonable attorney's fees.[6]

## IV.

## CONCLUSION

Accordingly, the judgment of the Circuit Court of Fayette County is reversed, and the case is remanded for further proceeding consistent with this opinion.

Reversed and Remanded.

**6.** In Syllabus Point 4 of *Aetna Casualty & Surety Co. v. Pitrolo*, 176 W.Va. 190, 342 S.E.2d 156 (1986), we elaborated on the factors a court should consider in deciding whether an award of attorney's fees is reasonable.