454 S.E.2d 54

**Mark CAPPER, Anita M. Lefevre, et al., dba Mauser Hall Partnership, Plaintiffs Below, Appellees,**

v.

**Fred GATES, dba Gates Associated, Defendant Below, Appellant.**

No. 21996.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1994.

Decided Dec. 8, 1994.

Michael L. Scales, Greenberg & Scales, Martinsburg, for appellees.

William B. Carey, Berkeley Springs, for appellant.

NEELY, Justice.

Fred Gates, a surveyor, appeals from a jury verdict entered against him in the Circuit Court of Jefferson County for $50,000 in compensatory damages and $50,000 in punitive damages, based on allegations of professional negligence and fraud during the course of his employment with the Mauser Hall Partnership. Mr. Gates also appeals from the circuit court's award of pre-judgment interest and attorneys' fees ($25,416.07) and costs ($4,215.07). Based on our review of the record, we find Appellant's assignments of error without merit and, therefore we affirm the judgment of the Circuit Court of Jefferson County.

Mr. Gates was hired, fired, and subsequently sued by the owners of Mauser Hall, a 247 acre farm located in the southern part of Jefferson County. A small portion of the property lies across the state line, in Virginia. Mauser Hall was owned by Henry Capper until his death in the mid–1980's, when his six grandchildren inherited the property and, together, formed the management company of Mauser Hall Partnership ("Partnership").

The Partnership decided to develop Mauser Hall by creating a residential subdivision. All residential subdivisions need approval from the Jefferson County Planning Commission and the Jefferson County Health Department. Specifically, subdivisions must comply with the Jefferson County subdivision regulations adopted in 1979, pursuant to *W.Va.Code* 8–24–28 [1969], *et seq.*

Effective 5 October 1988, Jefferson County adopted a zoning ordinance, which would have designated the Mauser Hall area as a "rural/agricultural" zone. Because the new zoning ordinance would have a negative impact upon their planned development, the Partnership decided to secure approval as a subdivision from the Planning Commission before the 5 October 1988 deadline. The Planning Commission's approval would provide "grandfather" protection from the new zoning restrictions and development could continue.

In May 1988, the Partnership hired Mr. Gates to navigate the project through the myriad regulations before the October 1988 deadline. The individual members of the Partnership, residing out-of-state, relied upon Mr. Gates for information and to handle the subdivision approval process. As part of this process, Mr. Gates: (1) prepared an initial concept plat; (2) hired a perc tester [1]; (3) dealt with a "road access" issue by contacting the State Highway Department; (4) managed the paperwork; and (5) attended

---

1. A perc tester evaluates soil to determine the degree of percolation to be expected, something that is crucial for creating sanitary septic systems.

the meetings and hearings required by the Jefferson County Ordinance.

Ultimately the development was limited to only the eighty-eight (88) southernmost acres. The chief obstacle facing the Mauser Hall project was obtaining the Health Department's permission to install septic systems on the individual lots. In August 1988, the Planning Commission issued an order that any application submitted by the 5 October 1988 deadline would be accepted even if incomplete, but only if the incomplete matters required additional action by governmental agencies. Thus Mr. Gates was able to obtain conditional approval for development of the scaled back development before the October deadline; however, the approval was conditioned upon the Health Department's issuing septic permits.

The Mauser Hall project was situated on "Chilhowie Silty Soil", which presents severe percolation problems. Septic systems work best in soil that percolates well. Due to the percolation problems, Mr. Gates planned to "collapse" the lots, creating fewer lots with increased lot sizes. Land that percolates poorly can sometimes still be used with septic systems if there are fewer lots with larger acreage.

Mr. Gates allegedly believed that eventually the proper balance could be found that would provide sufficient percolation, and that the project would then secure Health Department approval. Mr. Gates submitted a plat outlining sixty-three (63) lots on the eighty-eight (88) acres, with the option to collapse down to forty-four (44) lots, if necessary. After review by the Planning Commission, the plat was passed to the Health Department for approval.

After the County Health Department consulted with Ron Estepp, an independent professional soil scientist (who visited the site twice to assess the soil percolation potential), the Mauser Hall project application was denied on 8 March 1989. On 21 April 1989, the Partnership fired Mr. Gates. The Partnership paid Mr. Gates a total of $67,172.27,

including $51,102.23 in fees and $16,070.04 for expenses. (Tr.Vol. III at 451–452) After consulting with P.C. DiMagno, an engineer contacted before hiring Mr. Gates, the Partnership decided not to resume the development project.

The Partnership alleges that Mr. Gates was negligent in not discovering the project's insurmountable percolation difficulties early enough to save the Partnership roughly $70,-000. By failing to review the applicable soil reports and percolation tests to determine the land subdivision was not viable, Mr. Gates breached the duty of care of land surveyors in similar circumstances and proximately caused the Partnership's financial loss. In addition, Mr. Gates allegedly defrauded the Partnership once he was aware of the project's doomed status, by failing to send them a copy of Mr. Estepp's 10 October 1988 letter to the Jefferson County Health Department indicating that the project was not viable.

Mr. Estepp's letter stated that: "[i]n summary, large areas of this tract have problems which include shallowness to bedrock, a seasonal high water table, and potentially slow permeability...." The Partnership alleged that concealing this letter shows that even after Mr. Gates knew that the project was not economically viable, Mr. Gates fraudulently induced the Partnership to continue funding the development project for Mr. Gates' personal profit. The Partnership remained unaware of the situation and continued to write checks to Mr. Gates until they received a letter directly from the Health Department on 8 March 1989, outlining the insurmountable problems with the development project. That letter also stated that the Health Department had reported that the proposed development project was impractical to Gates Associates, based on preliminary investigations as early as September 1988.

On appeal, Mr. Gates asserts sixteen different assignments of error that can be grouped into the following five categories.[2]

---

**2.** The one assignment of error that does not fit into these categories is Mr. Gates' claim that the circuit court wrongly allowed recovery of contract damages, despite prosecution as a tort claim. Although the appellant attempts to recast the proceedings below as contractual, we find this claim to be without merit.

First, Mr. Gates takes issue with numerous trial court discovery decisions regarding the admissibility of evidence and the deposing of expert witnesses. Second, Mr. Gates asserts the evidence was insufficient to support a verdict of negligence or fraud. Third, Mr. Gates asserts that the trial court erred by holding him to the higher standard of care applicable to "professionals." Fourth, Mr. Gates asserts error in the verdict form that allowed the jury to find him liable for two allegedly inconsistent torts, negligence and fraud, and that also allowed damages to be assessed without identifying which portion was for negligence, and which for fraud. Fifth, Mr. Gates objects to the various attorneys' fees, prejudgment interest and compensatory and punitive damages assessed against him.

## I.

Mr. Gates assigns a number of errors that are evidentiary in nature. We have held that "[r]ulings on the admissibility of evidence are largely within a trial court's sound discretion and should not be disturbed unless there has been an abuse of discretion." *State v. Louk,* 171 W.Va. 639, 301 S.E.2d 596, 599." Syl. pt. 2, *State v. Peyatt,* 173 W.Va. 317, 315 S.E.2d 574 (1983). Upon reviewing the evidence presented, we conclude that no abuse of discretion occurred.

First, Mr. Gates claims that the circuit court wrongfully allowed into evidence the written opinion of Mr. Estepp, a non-testifying expert. Mr. Estepp's written opinion discussing the difficulty of developing the Mauser Hall property was used to demonstrate that Mr. Gates knew that the subdivision project was doomed when he received Mr. Estepp's 10 October 1988 letter. As such, the 10 October 1988 letter is admissible as "original evidence" because it was part and parcel of the act of fraud itself. Previously we have held that a statement, which constitutes the fraud to be proven, is not hearsay. Franklin Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 8-2(A)(2)(a) at 119 (3rd ed. 1994), citing *State v. Fairchild,* 171 W.Va. 137, 298 S.E.2d 110 (1982). In this case it is the existence of the written opinion itself that is relevant.

Therefore, the circuit court did not err in admitting Mr. Estepp's letter.

Second, Mr. Gates asserts that the circuit court erred by admitting other experts' opinions made, without independent evaluation, in reliance on Mr. Estepp's opinion. We disagree. Rule 703 of the *West Virginia Rules of Evidence* states the permissible bases of opinion testimony by experts.

### Rule 703

### Bases of Opinion Testimony by Experts

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

One expert may reasonably rely on another expert's opinion in forming his own. Analysis of Rule 703 *Federal Rules of Evidence,* Rule 703, the identical counterpart to Rule 703 *WVRE,* supports this conclusion.

This means that the expert is permitted to learn the facts prior to trial by a variety of means such as personal examination, firsthand investigation, files, *reports of other specialists, or the reports or comments of professional observers.* The only requirement is that the sources be reliable in the sense that they are normally relied on in the expert's field, even though these materials may not qualify for admission into evidence.

[Emphasis added] Graham C. Lilly, *An Introduction to the Law of Evidence,* at 490 (2nd ed. 1987).

Rule 703 does not limit admissibility of expert opinions to opinions formed solely on the basis of first-hand experience. Franklin Cleckley, *Handbook on Evidence for West Virginia Lawyers,* § 7-3(B) (3rd ed. 1994). The ultimate determination of an expert's qualifications to state an opinion is left to the discretion of the circuit court. *Jones v. Garnes,* 183 W.Va. 304, 395 S.E.2d 548 (1990). The circuit court decision will generally not be reversed unless there has been an

abuse of discretion. *Id.* In this case, we find no abuse of discretion.

■ The final discovery issues will be deposed of briefly. The appellant asserts that the admission into evidence of the deposition transcript of Richard Chaffee was erroneous because the statements contain inadmissible hearsay.[3] Under Rule 32(a) *WVRCP* [1989], deposition testimony "may be used against any party who was present or represented at the taking of the deposition...." Although Mr. Gates was acting *pro se* at time of the deposition, he was present and had full opportunity to cross-examine Mr. Chaffee and object at that time. The circuit court judge reviewed the transcript and ruled on the admissibility of the portions read into evidence. We decline to disturb his judgment.

■ Mr. Gates also claims that his request, one month before trial, to depose the opposing party's expert witness, Mr. DiMagno, was wrongfully denied. We disagree. "Under Rule 26(b)(4) of the West Virginia Rules of Civil Procedure, there is no absolute right to take a discovery deposition of the other party's testifying expert witness. The rule requires interrogatories to be used first and leaves to the discretion of the trial court whether further discovery is warranted." Syl. pt. 9, *King v. Kayak Mfg. Corp.*, 182 W.Va. 276, 387 S.E.2d 511 (1989).

■ There was clearly no abuse of discretion here. Mr. DiMagno had been deposed twice before, albeit by a lawyer no longer involved in this case. As for Mr. Gates' claim that the circuit court erred by refusing to allow him to present two experts as rebuttal witnesses, which he identified for the first time two days after trial began, we disagree. The Appellant's Reply Brief offers the excuse that Mr. DiMagno's testimony "caught the defendant by surprise". Appellant's Reply Br. at 13–14. Therefore, Mr. Gates was unable to determine that the experts were needed as rebuttal witnesses before the trial began. Yet the evidence reveals that Mr. DiMagno's expert reports were submitted six months before trial. We find no reason that Mr. Gates shouldn't be expected to comply with the circuit court's pretrial order under Rule 16, *WVRCP*, [1988] requiring disclosure of experts before trial.

## II.

■ Mr. Gates also asserts that the circuit court erred by instructing the jury to apply the higher standard of care accorded to "professionals" because he was not acting in his "professional" capacity as a land surveyor as defined by *W.Va.Code*, 30–13A–1 *et seq.* [1969]. This assignment of error is not well taken. In fact, Mr. Gates, a licensed surveyor, represented himself to the Partnership as a "Land Surveyor, Civil Engineer, Land Planner, [and] Architect", all of which was boldly printed on his personal business card. (Pls.' Ex. 43)

Furthermore, his name was printed on the card as "Fred W. Gates, LLS". It is too late for Mr. Gates now, after all his actions to the contrary, to claim that he was not acting as a licensed land surveyor during his association with the Partnership. *Restatement (Second) of Torts* § 299A [1965] states:

> Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

See *Weaver v. Union Carbide Corp.*, 180 W.Va. 556, 558, n. 4, 378 S.E.2d 105, 107, n. 4 (1989).

Mr. Gates was engaged in a trade, namely land development consultation. In the process of carrying out this trade, he employed his skills as a land surveyor. Furthermore, according to the testimony of Mr. DiMagno, a registered civil-engineer who is also qualified to perform the duties of a licensed land surveyor in West Virginia, Mr. Gates had to use his professional judgment as a land surveyor to prepare the project's lay-out. (Tr. Vol. II at 299–300)

We find that the jury was properly instructed that Mr. Gates should be judged by the standard of care that a reasonably pru-

---

3. Mr. Chaffee had been hired by Mr. Gates to do perc testing on the Mauser Hall property.

dent surveyor and land development consultant would have applied with respect to the Mauser Hall development project. Sufficient evidence was presented to support the jury's conclusion that Mr. Gates did not meet that standard.

## III.

■ Mr. Gates claims that there was insufficient evidence to support the jury verdict finding him guilty of negligence and fraud, and that there was insufficient evidence to justify an award of punitive damages. We disagree. As a general rule, we find "questions of negligence and contributory negligence are for the jury when the evidence is conflicting or when the facts, though undisputed, are such that reasonable men may draw different conclusions from them". Syllabus, *Bradley v. Sugarwood, Inc.*, 164 W.Va. 151, 260 S.E.2d 839 (1979); Syl. pt. 3, *Davis v. Sargent*, 138 W.Va. 861, 78 S.E.2d 217 (1953).

In this case, there was ample evidence to support the jury's verdict. The record contains soil reports and percolation test results, which a reasonable professional surveyor, engaged in a land development project such as Mauser Hall, should have recognized as indicative of severe percolation problems and advised his clients accordingly. Mr. Gates negligently failed to realize the significance of that data. The evidence offered in support of this theory included the testimony of Mr. P.C. DiMagno, a registered civil engineer with his own firm, P.C. DiMagno Engineers & Surveyors, who testified as an expert civil engineer and surveyor.

Mr. P.C. DiMagno's firm had done several subdivisions in Jefferson County and was contacted by Mark Capper in 1988 to look at the Mauser Hall property and give him a price to develop the subdivision. Based upon physically inspecting the Mauser Hall land, reviewing the Jefferson County soils report, and reviewing the relevant subdivision regulations, Mr. DiMagno's firm declined to pursue the project. Mr. DiMagno reached this decision because, "after review, [of] mostly the soils report, it pointed to us it was going to be very difficult to develop this property in

the manner in which I understood Mark Capper to want to proceed on this development."

Mr. DiMagno did not convey this opinion to Mr. Capper at that time, instead he never called Mr. Capper back with a price estimate. Mr. DiMagno further testified that, "I would think that a professional land surveyor that was going to develop this piece of property would do the same things and the investigation that I did." (Tr.Vol. II, at 269–277) We find that the evidence supports the jury's conclusion that Mr. Gates' negligence was the proximate cause of the roughly $70,000 loss by the Partnership.

■ There was also sufficient evidence to support the jury's finding of fraud. We have previously stated that the elements of fraud are: "(1) that the act claimed to be fraudulent was act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied upon it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied upon it." Syl. pt. 1, *Horan v. Turnpike Ford, Inc.*, 189 W.Va. 621, 433 S.E.2d 559 (1993); *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981). The evidence supports the conclusion that Mr. Gates defrauded the Partnership because he knew that the subdivision project was not viable because he knew of the soil and rock configuration as early as September 1988, if not before, and he withheld that information, continuing to bill his clients.

Richard Chaffee, the perc tester hired by Mr. Gates, who performed the percolation tests in September of 1988 testified that:

Q. After that was performed, did Mr. De-Haven [Jefferson County Health Department Sanitarian], make any recommendations or assessments?

A. Specifically, I can't recall—his—he expressed to me that general attitude, almost identical to Mr. Reed's [West Virginia State Health Department official], that there were major problems on site ...

Q. Well, did you have the occasion to speak to the Defendant, Mr. Gates, about what Mr. DeHaven's reaction was after he had made his assessment?

A. Yeah. I think in both instances I told Mr. Gates that I had been on site with both ... and that what they were telling me is that they had major concerns, major—they saw major problems on the site.

(Dep.Tr. at 31–33)

Q. Did you personally ever make any negative reports about the feasibility of the project, the Mauser Hall project, with the defendant, Fred Gates, after you had performed your work ... on the six-foot holes and the percolation tests and the additional work that you had to do?

A. You mean in regards to the feasibility of sewerage systems on the site?

Q. Yes.

A. Yes throughout the whole thing.

Q. And you told this to Mr. Gates?

A. Yep. Many times ...[h]alf a dozen or more.

(Dep.Tr. at 33–34)

Mr. Gates knew that the project was doomed, yet he continued to foster the Partnership's belief that the subdivision project was viable. During trial the appellants asserted that if they had known of the insurmountable soil problems they would have stopped the project at that point. Mark Capper testified that he had several conversations with Mr. Gates about the soil and rock problems; however, Mr. Gates repeatedly assured him that the project was viable. [Tr.Vol. I, at 170, 171, 176, 177, 200, 201]

Particularly damning was Mr. Gates' concealment from the Partnership of the 10 October 1988 letter to the Jefferson County Health Department written by Mr. Estepp stating "[i]n summary, [that] large areas of this tract have problems which include shallowness to bedrock, a seasonal high water table, and potentially slow permeability...." This fraudulent concealment induced the Partnership to proceed with the project and pay Mr. Gates almost $70,000.00 for fees and costs, and roughly $51,000 of that amount was for Mr. Gates time and profit. Thus, the Partnership did not learn that the project was not economically feasible until they received the 8 March 1989 letter written by the Jefferson County Health Department Director, Dr. Earl Allara.

Dr. Allara's letter stated that:

"Numerous visits to the site have been made *including preliminary investigations prior to your submittal.* An engineer with the WV State Department of Health had visited the site *last year* and indicated that it would not be practical to develop the land due to rock outcroppings and sinkholes. One-acre lots were being proposed at that time.

The Jefferson County Health Department made a preliminary evaluation of lot #'s 1–34 in *September of 1988.* It was determined that there were substantial problems with shallow depth to limestone bedrock and seasonal water table. *Two visits* have been made by the Regional Soil Scientist with the USDA Soil Conservation Service to confirm the water table problems. His [Ron Estepp's] reports are enclosed. *This information was reported to Gates Associated.*

In December of 1988, the Jefferson County Health Department received a plat proposing 1-acre lots....

Since then, the Department has made site evaluations and reviewed lot #'s 43–63. Although not every lot was evaluated, it is *obvious that there are insurmountable problems with shallow depth to bedrock, seasonal water, and active sinkhole.*

[Emphasis added.] (Pls' Ex. 20)

The Partnership relied on Mr. Gates' continued assertions of the project's viability, and continued to pour money into the doomed project. Mr. Gates continued to bill his clients for additional work even after he knew there was virtually no chance of approval from the Planning Commission. The failure to reveal the contents of the 10 October 1988 letter to his clients was judged to be fraudulent concealment by the jury. This verdict was supported by both the facts and the evidence before the court.[4]

---

4. Mr. Gates claims that the circuit court erred by allowing claims of both negligence and fraud because of the "intrinsic inconsistency" between these two charges. However, the appellant cites us to no law precluding this action. Mr. Gates was found negligent of failing to meet the appli-

■ Upon hearing all the evidence, the jury further concluded that Mr. Gates acted intentionally. As a general rule, we support the imposition of punitive damages under such circumstances. *Goodwin v. Thomas,* 184 W.Va. 611, 403 S.E.2d 13 (1991). Thus, we find that the jury properly awarded punitive damages against Mr. Gates.

## IV.

■ Without citing any West Virginia authority, Mr. Gates maintains it was error to give the jury instructions and a verdict form that did not force a choice between negligence and fraud. There is no abuse of discretion, however, in allowing the jury to find that both types of injury were inflicted.

The verdict form did not require the jury to apportion the damages awarded for negligence and for fraud. Instead the form itemized compensatory damages, $50,000 awarded; lost profits, nothing awarded; punitive damages, $50,000 awarded. In *Roberts v. Stevens Clinic Hosp., Inc.,* 176 W.Va. 492, 504, 345 S.E.2d 791, 803 (1986), we stated that the "[o]bject of tort law is to provide reasonable compensation for losses in an expeditious fashion." In this case, the verdict form allowed the jury properly to carry out this objective. Furthermore, we find nothing in the verdict form that would inhibit a reviewing court from deciding whether the verdict was supported by the evidence.

## V.

■ Mr. Gates' final assignments of error concerns the damages assessed. In Syl. pt. 3, *Adkins v. Foster,* 187 W.Va. 730, 421 S.E.2d 271 (1992), we stated that " '[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption.' Syl. pt., *Addair v. Majestic Petroleum Co., Inc.,* 160 W.Va. 105, 232 S.E.2d 821 (1977). Syl. pt. 5,

*Roberts v. Stevens Clinic Hosp. Inc.,* 176 W.Va. 492, 345 S.E.2d 791 (1986)." Given the facts and circumstances of this case we find that the jury verdict for $50,000 in compensatory damages and $50,000 in punitive damages is not excessive.

■ The Partnership paid Mr. Gates a total of $67,172.27, $16,070.04 of which covered project costs. The compensatory damage award equaled the $50,000 profit paid by the Partnership to Mr. Gates for his services from 17 May 1988 until he was fired on 26 April 1989. These compensatory damages were neither outrageous nor arbitrary.

The jury also awarded $50,000 in punitive damages. We have previously held that punitive damages should bear a reasonable relationship to compensatory damages, and should be in excess of the profits reaped by the defendant's wrongful act to discourage future bad acts. *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

The punitive award certainly bore a reasonable relationship to the $50,000 compensatory damage award and was not excessive. Generally, "[p]unitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for willfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong." Syl. pt. 3, *Chesser by Hadley v. Hathaway,* 190 W.Va. 594, 439 S.E.2d 459 (1993); Syl. pt. 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941); Syl. pt. 4, *Harless v. First Nat'l Bank in Fairmont,* 169 W.Va. 673, 289 S.E.2d 692 (1982). Furthermore, under this Court's holding in *TXO, supra,* Mr. Gates' willful and malicious actions could have resulted in a punitive damage award far in excess of the $50,000 actually awarded.

cable professional standard when he failed properly to interpret the results of soil and percolation tests. This negligence cost the partnership roughly $70,000 in fees and costs accrued before they realized their predicament and fired Mr. Gates. The fraud accrued from the time Mr. Gates read the negative assessment contained in

Mr. Estepp's 10 October 1988 letter. After failing to disclose the letter to his clients, Mr. Gates knowingly encouraged them to stick with a useless project. Under the facts of this case, then, there is no inconsistency in a finding of both negligence and fraud.

■ We also affirm the circuit court award of prejudgment interest. In contract or tort actions, prejudgment interest is available to a litigant as part of compensatory damages if there is an ascertainable pecuniary loss. *Bell v. Inland Mut. Ins. Co.*, 175 W.Va. 165, 176 n. 6, 332 S.E.2d 127, 137 n. 6, *cert. denied, Camden Fire Ins. Ass'n v. Justice*, 474 U.S. 936, 106 S.Ct. 299, 88 L.Ed.2d 277 (1985); *See Grove By and Through Grove v. Myers*, 181 W.Va. 342, 345 n. 4, 382 S.E.2d 536, 539 n. 4 (1989); *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 31, 404 S.E.2d 420, 423 (1991). The compensatory damage award offers a definite basis for determining prejudgment interest.

■ *W.Va.Code*, 56–6–31 [1981] provides that special damage awards "shall bear interest from the date the right to bring the same shall have accrued, as determined by the court." Special damages include "lost wages and income, medical expenses, damages to tangible personal property, and *similar out-of-pocket expenditures*, as determined by the court." [Emphasis added.] In Syl. pt. 1, *Buckhannon–Upshur County Airport Authority v. R & R Coal Contracting, Inc.*, 186 W.Va. 583, 413 S.E.2d 404 (1991), we stated:

> "[p]rejudgment interest, according to West Virginia Code § 56–6–31 (1981) and the decisions of this Court interpreting that statute, is not a cost, but is a form of compensatory damages intended to make an injured plaintiff whole as far as loss of use of funds is concerned."

*Accord* Syl. pt. 7, *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196, 208 *cert. denied, Buracker v. Wilt*, —— U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994).

We find that the $50,000 paid to Mr. Gates by the Partnership is included within the phrase "similar out-of-pocket expenditures" used in *W.Va.Code*, 56–6–31 [1981], and prejudgment interest may be awarded under that section. The $50,000 represents the Partnership's out-of-pocket losses caused by Mr. Gates' negligence and are special damages upon which prejudgment interest may be awarded reasonably to compensate the Partnership for its injury. Because Mr. Gates received the final portion of his $50,000 fee on 11 April 1989, we find that the circuit court did not err in calculating prejudgment interest from that date.

■ We also affirm the circuit court order awarding $21,201.00 in attorneys' fees and $4,215.07 in costs.[5] Mr. Gates asserts that the retroactive imposition of attorney fees was without precedent and contrary to the basic notice requirements of due process. In Syl. pt. 2, *Sally–Mike Properties v. Yokum*, 179 W.Va. 48, 365 S.E.2d 246 (1986), we observed that "[a]s a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." *See, e.g., Yost v. Fuscaldo*, 185 W.Va. 493, 499, 408 S.E.2d 72, 78 (1991). This is generally referred to as the American Rule.

Mr. Gates asserts that the imposition of attorneys' fees based on retroactive application of *Bowling v. Ansted Chrysler–Plymouth–Dodge*, 188 W.Va. 468, 425 S.E.2d 144 (1992) would violate his due process rights. However, nine years before *Bowling*, in 1983 we held that "[a] well established exception to the general rule prohibiting the award of attorney fees in the absence of statutory authorization, allows the assessment of fees against a loosing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Nelson v. Public Employees Ins. Bd.*, 171 W.Va. 445, 451, 300 S.E.2d 86, 92 (1982) [citations omitted].

Prior to the 18 June 1992 jury verdict against Mr. Gates, in *Yost, supra*, we had already ruled that a jury verdict of fraud qualifies for an award of attorneys' fees under the long standing West Virginia exception to the American Rule. In *Yost*, we held that "[a]fter considering the jury's finding of fraud, this Court can only conclude that the appellees' actions below were *oppressive* and

5. Mr. Gates asserts that a ruling allowing attorney fees is erroneous because the circuit court lacked jurisdiction to issue any further rulings on the date the attorney's fees were granted. We affirm the circuit court's 3 September 1993 opinion upholding jurisdiction. The Partnership's motion for attorney's fees was timely filed, and the circuit court had a continuing duty to make a post-trial decision on this issue.

wanton, and should be discouraged [t]hus, we find that the appellant should be reimbursed by all of the defendants below for the attorney fees expended...." *Yost*, 185 W.Va. at 500, 408 S.E.2d at 79 (1991).

Our holding in *Yost, supra,* awarding attorney fees to a successful plaintiff for a fraud claim, was merely *explained* in Syl. pt. 4, *Bowling, supra.* Syl pt. 4, *Bowling, supra,* stated:

"[w]here it can be shown by clear and convincing evidence that a defendant has engaged in fraudulent conduct which has injured a plaintiff, recovery of reasonable attorney's fees may be obtained in addition to the damages sustained as a result of the fraudulent conduct."

Thus Mr. Gates' argument that *Bowling, supra,* was a new decision departing from previous substantive law is without merit.

For the reasons set forth in this opinion, the judgment of the Circuit Court of Jefferson County is affirmed.

Affirmed.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.