**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

In Re: STANLEY MARSHALL ELLISON;
KAY DEARING ELLISON,

*Debtors.*

AIRLINES REPORTING CORPORATION,
*Plaintiff-Appellee,*

v.

STANLEY MARSHALL ELLISON; KAY
DEARING ELLISON,
*Defendants-Appellants.*

No. 01-2277

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
David A. Faber, District Judge.
(CA-00-1067-5, BK-94-50123, AP-94-96)

Argued: May 7, 2002

Decided: July 11, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
LUTTIG, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Niemeyer wrote the opinion, in which Chief Judge Wilkinson
joined. Judge Luttig wrote a dissenting opinion.

---

## COUNSEL

**ARGUED:** James R. Sheatsley, GORMAN, SHEATSLEY & COM-
PANY, L.C., Beckley, West Virginia, for Appellants. R. Terrance

Rodgers, ALLEN, GUTHRIE & MCHUGH, Charleston, West Virginia, for Appellee. **ON BRIEF:** Nicholas P. Mooney, II, ALLEN, GUTHRIE & MCHUGH, Charleston, West Virginia; C. Erik Gustafson, LECLAIR RYAN, P.C., Alexandria, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

Airlines Reporting Corporation ("ARC") commenced this adversary proceeding in the Chapter 7 bankruptcy of Stanley Marshall Ellison and Kay Dearing Ellison to establish the Ellisons' liability on their personal guarantees of their travel agency's indebtedness to ARC and to establish that this indebtedness is nondischargeable under 11 U.S.C. § 523(a)(4). The district court concluded that the Ellisons are indebted to ARC in the amount of $574,678 and that this indebtedness arose from the Ellisons' defalcation while acting in a fiduciary capacity and therefore is nondischargeable. On appeal, we affirm the district court's conclusion that the Ellisons' indebtedness on their personal guarantees is nondischargeable but remand for further factfinding with respect to the amount of indebtedness.

I

Stanley Ellison and his wife, Kay Ellison, were officers, directors, and shareholders of Sovereign World Travel, Ltd. ("Sovereign Travel"), a West Virginia corporation operating a travel agency in Charleston, West Virginia. To facilitate its business of selling airline tickets, Sovereign Travel entered into an Agent Reporting Agreement with ARC, a Delaware corporation owned by various airline carriers, that acted as the carriers' agent for issuing airline tickets and collecting the payment for those tickets from travel agents.

The Agent Reporting Agreement provided for a trust arrangement, under which Sovereign Travel collected payments for the sales of airline tickets, placed the proceeds of those sales in a trust account with the Whitesville State Bank for the benefit of ARC, and reported to ARC weekly on the ticket sales made to customers. The deposited

proceeds, excluding Sovereign Travel's commissions, were designated as "the property of the carrier and [were to] be held in trust until accounted for to the carrier." After Sovereign Travel submitted its sales report to ARC, ARC paid itself with checks that ARC drew on the trust account. Sovereign Travel and ARC also executed a "Cushion Agreement," whereby Sovereign Travel agreed to keep a cushion of $100,000 in the same trust account and whereby the parties agreed that withdrawals would "be permitted by ARC drafts only."

In addition to Sovereign Travel's undertakings with ARC, ARC required, as a condition of allowing Sovereign Travel to remain on its approved agency list, the personal guarantees of the Ellisons. Accordingly, the Ellisons signed personal guarantees of performance under which they "promise[d] and guarantee[d] the unconditional payment by [Sovereign Travel] . . . of all indebtedness, liabilities and obligations of every nature and kind arising out of or in connection with the [Agent Reporting Agreement]" between ARC and Sovereign Travel.

In late 1993, Sovereign Travel began experiencing financial difficulties. It began to fail to deposit proceeds of the ticket sales into the trust account with Whitesville State Bank, and it began to fail to submit weekly sales reports to ARC. When ARC attempted to draw from the trust account, checks were returned for insufficient funds. These failures of performance by Sovereign Travel were the result of the Ellisons' personal decisions and conduct. The Ellisons were involved in the supervision and handling of the day-to-day operations of Sovereign Travel and the handling of the relationship between Sovereign Travel and ARC. And to the extent that Sovereign Travel in fact went out of trust in its relationship with ARC, the Ellisons acknowledge that they were the ones responsible for the corporation's actions.

In January 1994, Sovereign Travel filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code.[1] And a few months later, in April 1994, the Ellisons followed, filing this Chapter 7 proceeding.

---

[1]The actual debtor in that proceeding is Great American Holding Company which succeeded to the assets and obligations of Sovereign Travel.

ARC filed a complaint against the Ellisons in this bankruptcy proceeding, seeking a judgment of $342,207 based on the Ellisons' personal guarantees of Sovereign Travel's indebtedness to ARC and a declaratory judgment that the Ellisons' indebtedness to ARC is nondischargeable under 11 U.S.C. § 523(a). In its complaint, ARC alleged that because of the Ellisons' personal involvement in Sovereign Travel's defalcation to ARC, the liability of the Ellisons on their personal guarantees to ARC is nondischargeable on three grounds: (1) fraud under 11 U.S.C. § 523(a)(2)(A); (2) defalcation "while acting in a fiduciary capacity and/or embezzlement" under 11 U.S.C. § 523(a)(4); and (3) "willful and malicious injury . . . to ARC" under 11 U.S.C. § 523(a)(6).

On ARC's motion filed in the adversary proceeding, the bankruptcy court granted ARC partial summary judgment, finding the Ellisons liable on their personal guarantees and declaring that indebtedness nondischargeable under 11 U.S.C. § 523(a)(4). The court concluded that the Ellisons defaulted while acting in a fiduciary capacity based on the following:

> The fiduciary relationship between ARC and [Sovereign Travel] is clearly set out in the [Agency Reporting Agreements], and the defendants' liability for those obligations is equally clear from the two personal guarantees executed by each of them individually, and the fact that the defendants have both admitted responsibility for handling the weekly sales reports and the trust account at Whitesville State Bank.

The court explained its conclusions as follows:

> The defendants had both a fiduciary duty to ARC in the execution of the [Agency Reporting Agreement] which created an express trust relationship with respect to the Traffic Documents and the trust account at the Whitesville State Bank, and a fiduciary duty to [Sovereign Travel] as officers and directors to ensure that [Sovereign Travel] complied with the terms of the [Agency Reporting Agreement] so as not to lose its agency listing. Defendants were instrumental in the actions which constituted the defalcation, and thus must be held personally liable for their breach of fiduciary duty.

Following the entry of the partial summary judgment on liability, the bankruptcy court conducted a hearing on damages and held that the Ellisons were obligated to ARC in the amount of $391,062 in principal and $183,616 in prejudgment interest, for a total of $574,678. In computing these damages, the court concluded that the Ellisons were responsible for reimbursing the airline carriers at the standard coach rates for tickets sold and not at the lower tour rates under which Sovereign Travel allegedly sold the tickets.

On appeal, the district court affirmed, entering judgment in favor of ARC on September 20, 2001. From the district court's judgment, this appeal followed.

II

The Ellisons contend that the district court erred in holding that their indebtedness to ARC, based on their personal guarantees of Sovereign Travel's obligations, was not dischargeable under 11 U.S.C. § 523(a)(4). The Ellisons point out that it was Sovereign Travel, not they, who had a fiduciary relationship with ARC and that, as officers and directors of Sovereign Travel, they owed no fiduciary duty *to ARC*. They also note that being guarantors of Sovereign Travel's indebtedness did not place them in a fiduciary relationship with ARC. They argue that their fiduciary duty to Sovereign Travel as its officers and directors is "irrelevant" and that Sovereign Travel's trust relationship with ARC was not imputable to them personally. In sum, the Ellisons contend that neither their fiduciary duty to Sovereign Travel, based on being officers and directors of Sovereign Travel, nor Sovereign Travel's fiduciary duty to ARC, based on the Agent Reporting Agreement, translates into a fiduciary relationship between the Ellisons and ARC. *See, e.g.*, *In re Long*, 774 F.2d 875, 878 (8th Cir. 1985) ("We question . . . the propriety of opposing a corporation's fiduciary duties on a stockholder-employee in the absence of such a local rule"); *In re Cross*, 666 F.2d 873, 880-81 (5th Cir. 1982) (concluding that the exception to discharge for defalcation while acting in a fiduciary capacity required a fiduciary obligation to the creditor, not just a fiduciary duty to the corporation for which the officer worked).

Thus, the issue that the Ellisons raise is whether the Ellisons' indebtedness to ARC, based on their personal guarantees, is "for fraud

or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." If it is, then under 11 U.S.C. § 523(a)(4), their indebtedness is not dischargeable in bankruptcy.

We begin by recognizing that by simply guaranteeing Sovereign Travel's debt to ARC, the Ellisons did not place themselves in a fiduciary relationship with ARC. *See, e.g.*, *In re Levitan*, 46 B.R. 380, 386-87 (Bankr. E.D.N.Y. 1985) (holding that an ordinary security agreement did not create a fiduciary relationship between debtor and creditor). But in this case, there are three additional facts that we must consider.

First, Sovereign Travels's indebtedness to ARC arose out of the breach of a fiduciary relationship between the two corporations. Under the Agent Reporting Agreement, Sovereign Travel was obliged to collect payments for the sale of tickets and place those payments in a trust account with Whitesville State Bank for the benefit of ARC and subject only to ARC's withdrawals. The Agent Reporting Agreement provided that these proceeds, less commissions due to Sovereign Travel, were the "property of the carriers," to be "held in trust" by Sovereign Travel "until satisfactorily accounted for to the carriers." Because Sovereign Travel failed to place ticket-sales proceeds into the trust account and failed to report to ARC the sales that generated these proceeds, Sovereign Travel breached the trust arrangement and therefore defalcated "while acting in a fiduciary capacity" with respect to these funds. *See In re Ansari*, 113 F.3d 17, 20-21 (4th Cir. 1997); *see also In re Uwimana*, 274 F.3d 806, 811 (4th Cir. 2001) (stating that even negligence or an innocent mistake could constitute a defalcation under § 523(a)(4)).

Second, the Ellisons, when acting as officers and directors of Sovereign Travel, "occupied a fiduciary relationship toward [Sovereign Travel]" under West Virginia law. *See Bailey v. Vaughan*, 359 S.E.2d 599, 605 (W. Va. 1987) (internal quotation marks and citation omitted).

Third, the Ellisons were personally responsible for the conduct that gave rise to Sovereign Travel's defalcation to ARC. They personally handled Sovereign Travel's weekly sales reports and ARC's trust account at the Whitesville State Bank. And they withheld money that

was designated to be placed in trust for ARC, causing Sovereign Travel's default. Thus, it was the Ellisons themselves who depleted ARC's trust funds to the point that checks properly drawn on the trust account were returned for insufficient funds. In short, the Ellisons' personal conduct brought about Sovereign Travel's defalcation to ARC. And while an officer of a corporation is in no way personally liable for corporate torts solely on account of his corporate position, where the officer actually participates in or otherwise sanctions the tortious acts, personal liability may lie. *See Bowling v. Ansted Chrysler-Plymouth-Dodge, Inc.*, 425 S.E.2d 144, 149 (W. Va. 1992).

Thus, in this case, not only did the Ellisons guarantee Sovereign Travel's indebtedness and performance to ARC, they also created that very indebtedness through their personal conduct by single-handedly causing the corporation to breach its trust arrangement with ARC. In doing so, they also breached their fiduciary duty to the corporation as officers and directors, and their tortious conduct made them jointly and severally liable with the corporation vis-a-vis ARC, quite apart from their personal guarantees.

Based on the confluence of: (1) the Ellisons' personal guarantees to ARC of Sovereign Travel's indebtedness; (2) the fact that Sovereign Travel's indebtedness arose from Sovereign Travel's breach of its fiduciary duty to ARC; (3) the fact that Sovereign Travel's breach of a fiduciary duty was brought about by the Ellisons' personal conduct; and (4) the fact that the Ellisons' conduct amounted to a breach of their fiduciary duty to Sovereign Travel, we conclude that the Ellisons' indebtedness to ARC under the personal guarantees was from their defalcation while acting in a fiduciary capacity and therefore is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(4). In so holding, we recognize that the class of nondischargeable debts is indeed quite narrow, *see, e.g.*, *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998), but we also avoid a construction so narrow as to eviscerate § 523(a)'s purpose of preventing debtors such as the Ellisons, from avoiding, through bankruptcy, the consequences of their wrongful conduct. *See, e.g.*, *In re Magpusao*, 265 B.R. 492, 496 (Bankr. M.D. Fla. 2001) ("Exceptions to discharge prevent a debtor from avoiding the consequences of wrongful conduct by filing a bankruptcy case"); *In re Chapman*, 228 B.R. 899, 908 n.7 (Bankr. N.D. Ohio 1998) (stating that § 523(a) exceptions to discharge "are designed to prevent the

debtor from avoiding, through a bankruptcy filing, the consequences of wrongful conduct"); *In re Portner*, 109 B.R. 977, 985 (Bankr. D. Colo. 1989) (noting the need to balance "the fresh start policy [with] preventing a dishonest debtor from avoiding through bankruptcy the consequences of wrongful . . . conduct"); *In re Wheeler*, 101 B.R. 39, 47 (Bankr. N.D. Ind. 1989) (same); *In re Mayo*, 94 B.R. 315, 322-23 (Bankr. D. Vt. 1988) (same); *In re Levitan*, 46 B.R. at 383 ("Many of the exceptions [to discharge] are intended to prevent a debtor from avoiding through bankruptcy the consequences of his wrongful conduct").

Stated otherwise, the Ellisons, through their wrongful conduct, brought about the very indebtedness which they now seek to discharge. They controlled — through a willingness to breach their fiduciary duty to Sovereign Travel — Sovereign Travel's ability to satisfy its fiduciary duty to ARC. Combined with the Ellisons' personal guarantees, this control makes separating the Ellisons from Sovereign Travel's defalcation while acting in a fiduciary capacity impossible. Accordingly, we agree with the district court that the Ellisons' indebtedness to ARC was caused solely by the Ellisons' breach of trust and is therefore not dischargeable under 11 U.S.C. § 523(a)(4). *Cf. In re Folliard*, 10 B.R. 875, 876 (D. Md. 1981) ("An officer of a corporation 'who knowingly causes the misappropriation of trust property by the corporation is personally liable for participation in the breach of trust committed by the corporation'" (citation omitted)).

III

The Ellisons also contend that the district court erred in calculating the amount owed to ARC under their personal guarantees. They maintain that the district court based the reimbursement amount on standard commercial fares when many of the airline tickets were actually sold at lower tour rates. The bankruptcy court based its use of the higher rates on the fact that Sovereign Travel — through the Ellisons — failed to report its sales in a timely manner, thereby forfeiting the right to use the lower tour rates actually collected from the customers. The Ellisons argue that use of the higher rates by the court is not justified by the contractual relationship and thus constitutes a penalty, not damages.

At the December 6, 1999 hearing on damages, the Ellisons offered into evidence several contracts setting the tour rates owed to the airlines for tickets sold by Sovereign Travel. The agreed-upon tour rates were substantially lower than the usual commercial coach rates that were charged by the carriers to independent third-party ticket purchasers. ARC objected to this evidence because it had not been produced in advance of the hearing and asserted on the merits that, by failing to remit the money owed to the carriers promptly, Sovereign Travel was not entitled to the benefit of the contracted prices, even though this position is not supported by the contracts themselves. In response to ARC's objection, the bankruptcy court noted that there was insufficient time after the summary judgment ruling for Sovereign Travel to produce the documents in advance, and accordingly the court allowed the contracts to be admitted with the following accommodation to ARC:

> Instead of just disregarding totally that evidence [the contracts] from the Defendants, what we are going to do is give the Plaintiffs an opportunity to submit, by affidavit. I don't think the Plaintiffs ought to be put to the expense of coming to another trial and another hearing, and if the Plaintiffs can show to me, by sufficient affidavit, that you don't get the benefit of a tour agreement, unless you remit the reduced prices promptly, then I think they are entitled to judgment with respect to those matters.

Following the hearing, ARC filed an affidavit, stating that there were no records to support the Ellisons' contention that they were entitled to the negotiated tour rates "because of passage of time" and due to the Ellisons' failure to remit money owed to the carriers promptly. The bankruptcy court accepted ARC's explanation and, despite the lack of such contingencies in the negotiated tour rates, calculated damages based on the higher commercial coach rate. We conclude that this was error.

It is well settled that damages for breach of contract "must be such as will give, and only such as will give, compensation for the actual loss directly flowing from the breach of the contract." *Horn v. Bowen*, 67 S.E.2d 737, 739 (W. Va. 1951) (internal quotation marks and citation omitted). Contract damages must reflect what the injured party

would have received had the contract been performed; they cannot be punitive. *Id.* And, as long as a contract is not ambiguous, extrinsic evidence cannot supply the terms of the contract. *See, e.g.*, *Larew v. Monongahela Power Co.*, 487 S.E.2d 348, 352 (W. Va. 1997); *Marshall v. Elmo Greer & Sons, Inc.*, 456 S.E.2d 554, 557 (W. Va. 1995).

Applying these well-settled principles to this case, the Ellisons' debt to ARC should have been calculated based on the contract price negotiated between the Ellisons and the airlines. Had the Ellisons met their responsibility of holding the proceeds of air travel sales in trust and submitting sales reports, ARC would have been entitled to draw only the negotiated tour rates from the trust account. And because the contracts clearly did not make the negotiated tour rates contingent on payment by a certain date, the bankruptcy court erred by relying on ARC's affidavits to discredit those rates. At bottom, if the tour rates were those actually applicable, the calculation based on standard commercial rates amounted to a penalty, in violation of well-accepted contract principles.

Notwithstanding this error, ARC argues that the contracts for tour rates produced by the Ellisons were never executed and therefore were invalid. But this issue has never been addressed by the bankruptcy court. Because we believe that the contracts' validity should be decided in the first instance by the bankruptcy court, we will remand the damages issue for further factual findings by the bankruptcy court. To the extent that it might be established that there were no valid contracts for tour rates or reduced fares, we would agree that the standard commercial rates applicable at the time of the Ellisons' defalcation would be the appropriate measure for the Ellisons' debt.

Accordingly, we vacate the award of damages and remand that issue for further factfinding.

IV

In sum, we affirm the bankruptcy court's ruling that, under 11 U.S.C. § 523(a)(4), the Ellisons' indebtedness to ARC based on their personal guarantees to ARC of Sovereign Travel's indebtedness is a

nondischargeable debt. And on the issue of damages, we vacate the award and remand for further factfinding.[2]

*AFFIRMED IN PART, VACATED IN PART,*
*AND REMANDED FOR FURTHER PROCEEDINGS*

LUTTIG, Circuit Judge, dissenting:

Section 523(a)(4) of the Bankruptcy Code provides that any debt "for fraud or defalcation while acting in a fiduciary capacity" is non-dischargeable in Chapter 7. The majority agrees that the Ellisons owed no fiduciary duty to ARC. From that premise, it unavoidably follows that the district court's decision holding the Ellisons' debt to ARC non-dischargeable under this provision of section 523(a)(4) must be reversed. As I will explain below, the only defensible construction of the above-quoted provision is that the debt must have been incurred while the debtor was acting in a fiduciary capacity *with respect to the creditor seeking to take advantage of section 523(a)(4).* If there was no fiduciary duty owed by the debtor to the creditor, then section 523(a)(4) simply does not apply.

In its tortured path to the opposite conclusion, the majority creates a new avenue to non-dischargeability under section 523(a)(4). As I can best understand it, a debtor may be barred from discharging a debt in Chapter 7 if he owes a fiduciary duty to a corporation *other than* the creditor; that corporation, in turn, owes a fiduciary duty to the creditor seeking to invoke section 523(a)(4); the corporation commits defalcation while acting in a fiduciary capacity with respect to that creditor; the debtor "brings about" or "controls" that corporation's defalcation; the debtor simultaneously breaches a fiduciary duty owed to the corporation (but does not necessarily commit fraud or defalcation with respect to that corporation); and, last but not least, the debtor is a guarantor of that corporation's debts.[1]

---

[2]On the Ellisons' contention that the bankruptcy court abused its discretion in denying them leave to implead the trustee in the bankruptcy of Sovereign Travel (now Great American Holding Company), we conclude that the court did not abuse its discretion.

[1]None of these conditions is sufficient, in and of itself, to establish non-dischargeability under the majority's opinion, although I cannot tell

I would confine the scope of section 523(a)(4) to its text and reverse the district court's judgment.

## I.

I begin with the principle upon which we all agree — that the Ellisons owed no fiduciary duty to ARC. While the parties concede (and the majority holds) that *Sovereign World Travel* was "acting in a fiduciary capacity" with respect to ARC,[2] the Ellisons' personal guarantee

---

for sure whether each of these is necessary, in the majority's view, for this provision of section 523(a)(4) to apply. To give just one example, I am at a loss to understand how the Ellisons' guarantee of Sovereign Travel's indebtedness has anything to do with non-dischargeability under section 523(a)(4), which asks only whether a debt is "for fraud or defalcation while acting in a fiduciary capacity." The existence of a guarantee agreement has no bearing on whether the Ellisons committed fraud, committed defalcation, or acted in a fiduciary capacity, yet the majority includes it among the "confluence" of factors supporting its conclusion that the Ellisons' indebtedness to ARC is non-dischargeable under section 523(a)(4).

The guarantee agreement is certainly relevant to whether a debt *exists* between the Ellisons and ARC, but its use as a factor in support of the *non-dischargeability* of that debt under section 523(a)(4) remains a mystery to me.

[2] An issue that the parties do not address is whether the mere use of the word "trust" in the agreement between Sovereign World Travel and ARC is sufficient to establish a fiduciary relationship between the two corporations. The contract between Great American and ARC stated:

> [Great American] recognizes that the proceeds of the sales, less [Great American's] commissions, on these ARC traffic documents are the property of the carrier and *shall be held in trust* until accounted for to the carrier.

J.A. 304. But courts have not automatically found fiduciary relationships simply because a document uses the word "trust." *See Judd* v. *First Federal Savings and Loan Ass'n*, 710 F.2d 1237, 1241 (7th Cir. 1983) ("Simply stated, the words used in a document are not always conclusive evidence of a trust. The principal consideration is intent."); *In re Long*, 774 F.2d 875, 878-79 (8th Cir. 1985) ("It is the substance of the transaction, rather than the labels assigned by the parties, which determines

of Sovereign Travel's obligations in no way imputes Sovereign Travel's "fiduciary capacity" to the Ellisons. The majority correctly rejects the notion that a guarantor of a fiduciary's debts himself becomes a fiduciary by virtue of the guarantee agreement. *See ante*, at 5. A guarantee agreement is nothing more than a promise to answer for the payment of another's debt; it does not entail fiduciary obligations of any sort. Although *Sovereign Travel* may have been acting in a fiduciary capacity with respect to ARC, its guarantors were not.

Nor did the Ellisons become ARC's fiduciaries by virtue of their status as officers or as shareholders of Sovereign Travel. *See In re Long*, 774 F.2d 875, 878 (8th Cir. 1985) (holding that corporate officers are not charged with the corporation's fiduciary duties, in the absence of a state law rule creating fiduciary status in the officer). Officers and shareholders are not vicariously liable for the fiduciary obligations of their corporation, even if they "control" a corporation's ability to satisfy those obligations, unless there is reason to disregard the corporate form. Whether a court should "pierce the corporate veil" is a question of state law, and no argument or evidence in the record suggests that the Ellisons operated Sovereign Travel as a shell corporation, without observing the corporate forms, in an effort to defraud their creditors. In the absence of these circumstances, the officers of a corporate fiduciary do not themselves become fiduciaries.

The only other possible source of a fiduciary duty to ARC is the Ellisons' conduct. The majority hints that West Virginia tort law would hold the Ellisons directly and personally liable for their corporation's debt, *see ante* at 7, although this issue was never briefed or argued. (If the majority really believed that the Ellisons' debt to ARC arose under West Virginia tort law, there would be no need to rely on the Ellisons' guarantee among its "confluence" of reasons for affirm-

---

whether there is a fiduciary relationship for bankruptcy purposes."). One could argue that, notwithstanding the language in the agreement, the ticket sale arrangements between Great American and ARC resemble more of a debtor-creditor relationship between sophisticated corporate parties, rather than the typical fiduciary relationship, where there is a difference in knowledge and power between the fiduciary and the principal. But the parties do not belabor this point, so neither do I.

ing the non-dischargeability order under section 523(a)(4); indeed, there would be no need to discuss the Ellisons' guarantee agreement at all.) But even if the Ellisons committed a business tort under West Virginia law, that *still* would not establish that the Ellisons owed a fiduciary duty to ARC.

## II.

Notwithstanding the absence of a fiduciary duty to ARC, the majority concludes that the Ellisons "act[ed] in a fiduciary capacity" under section 523(a)(4) because they owed a fiduciary duty *to their corporation*, Sovereign Travel. *See ante*, at 6-7. This construction of the statute is indefensible. If a fiduciary duty to someone other than the creditor is sufficient to satisfy the "acting in a fiduciary capacity" requirement of section 524(a)(3), then any creditor in bankruptcy can render his debt non-dischargeable by characterizing the debtor's actions as "fraud or defalcation," so long as, at the time the debt accrued, the debtor owed a fiduciary duty to someone else — anyone else. Any failure to pay a creditor, whether on a contract or an adverse court judgment, could be characterized as a "defalcation,"[3] once section 524(a)(3) is divorced from its requirement that the debtor owe a fiduciary duty *to the creditor* and commit an act of defalcation while acting in that fiduciary capacity. The majority's construction of section 523(a)(4) could exempt all of a fiduciary's debts from discharge in bankruptcy, even those debts incurred entirely apart from his duties as a trustee.

The alternative (and only sensible) construction of the nondischargeability provision would require that the debtor have "act[ed] in a fiduciary capacity" *with respect to the creditor*. On this reading ARC, of course, cannot prevail because even the majority agrees that the Ellisons owed no fiduciary duty to ARC. Yet the majority rejects this construction of the statute, and then attempts to confine the absurd results that would follow from its own interpretation of the "acting in a fiduciary capacity" requirement by adding additional (and non-textual) factors in determining whether creditors in ARC's position

---

[3]Black's Law Dictionary includes among its definitions of "defalcation" as "the act of a defaulter" and the "failure to meet an obligation." Black's Law Dictionary (6th ed.) 417.

can establish non-dischargeability under section 523(a)(4). *See ante*, at 7-8.

What appears to underlie the majority's decision is a concern that unscrupulous corporate officers might pilfer assets from corporate-controlled trust funds and then escape liability by filing for bankruptcy and hiding behind the corporate form. Perhaps the majority believes this is what the Ellisons are trying to do to ARC, as the opinion repeatedly labels the Ellisons' conduct as "wrongful," notwithstanding the Bankruptcy Court's explicit finding that "there is no evidence that the [Ellisons] committed actual fraud," J.A. at 308, and the lack of any findings of fact or evidence in the record to suggest moral culpability on the part of the Ellisons.[4]

But even assuming that the majority's grim characterization of the Ellisons' conduct is accurate, its declaration that granting a discharge would be at odds with the "purpose" of section 523(a), *see ante* at 7-8 (preventing debtors from "avoiding . . . the consequences of their wrongful conduct") cannot justify ignoring the only plausible construction of the statute's text in favor of the new judicially-created multi-factored nondischargeability provision. An equal but opposite "purpose" that could be gleaned from section 523(a) (as well as the rest of the Bankruptcy Code and the case law) is the policy of giving the debtor a "fresh start." It seems to me that this "purpose," no less than the one chosen by the majority, should guide interpretation of section 523(a). It is no answer to say the fresh start policy is conferred

---

[4]ARC alleged in its complaint that the Ellisons submitted certain weekly sales reports that were "false and misleading," J.A. 138, but the Ellisons denied this and the bankruptcy court "found no evidence" of this. J.A. 308. The bankruptcy court further stated that "ARC has not shown that [Sovereign Travel] actually failed to deposit monies received into the trust account at Whitesville State Bank or that [Sovereign Travel] actually withdrew monies from that account for use in daily operations." J.A. 308. Moreover, I am unable to find (and the majority does not cite) any evidence in the record or findings of fact by any court that would support the majority's characterization of the Ellisons' conduct as "wrongful." At worst, it appears the Ellisons failed to meet their financial obligations at a time when their business was struggling. In the absence of fraud or manipulation, that hardly constitutes "wrongful conduct," even though their failures would incur legal liability.

only on those who incurred their debts through "non-wrongful" conduct, as debts from all sorts of "wrongful conduct" are dischargeable under section 523(a)(4) in the name of giving the debtor a fresh start.

This nicely illustrates the pitfalls of attempting to construe statutes in accordance with a perceived statutory "purpose." Not only can multiple "purposes" be gleaned from a long and intricate statute such as the Bankruptcy Code, but courts have no principled basis for choosing among them. A legislative compromise has already resolved the competing policy concerns of giving the debtor a fresh start without letting people off the hook for, and therefore encouraging, "wrongful conduct." A court's task is to implement this compromise by applying the plain meaning of the statute, unadorned by divinations of statutory "purpose."

In any event, the majority's concerns of corporate officers evading the consequences of their wrongful conduct, in addition to being irrelevant to the task of statutory construction, are unfounded. Other nondischargeability provisions of the bankruptcy code, apart from section 523(a)(4), can prevent corporate directors and officers from using personal bankruptcy proceedings to escape liability for their misdeeds. Section 523(a)(2)(A), for example, provides that any debt for money obtained by "actual fraud" cannot be discharged in bankruptcy, whether or not the debtor acted in a fiduciary capacity when committing the fraud. And section 523(a)(6) states that debts "for willful and malicious injury by the debtor to another entity or to the property of another entity" will also survive bankruptcy. In short, the Bankruptcy Code provides creditors with ample protection from the shenanigans of corporate officers. But only a creditor to whom a fiduciary duty is owed by the debtor can establish non-dischargeability upon a mere showing of defalcation, and nothing more.

### III.

Perhaps the conclusion reached by the majority under its multi-factor test is just another way of saying that the Ellisons' conduct was sufficiently egregious to warrant setting aside the corporate form, and holding the Ellisons personally liable for Sovereign Travel's debt to ARC. Whether corporate forms may be disregarded is a question of state law, and ARC has not made any argument, in this appeal or in

the proceedings below, that the corporate veil should be pierced. Nor has the factual record been developed to allow this court to determine whether the Ellisons neglected the corporate forms in managing their business, whether they used the corporate form to perpetrate an injustice, or whether any of the nineteen factors that West Virginia courts consider in deciding whether to disregard the corporate form, *see Laya* v. *Erin Homes, Inc.*, 352 S.E.2d 93, 98 (W. Va. 1986), have been met.

The majority rescues ARC's forfeiture, and its failure to develop the necessary evidence on this issue, by rejecting a textual analysis of section 523(a)(4) and replacing it with a multi-factor test for non-dischargeability that will breed nothing but confusion and increased litigation.

## IV.

Because the majority's decision finds no support in the text of the bankruptcy code or in the record of the case, I respectfully dissent.